OLA LUCILLE WILKINS AND JAMES COLE
v. STATE OF MARYLAND

[No. 115, September Term, 1970.]

*Decided February 3, 1971.*

114

The cause was argued before MORTON, ORTH, and POW-ERS, JJ.

*Karl G. Feissner,* with whom were *Thomas P. Smith, William L. Kaplan, Frederick R. Joseph,* and *Andrew E. Greenwald* on the brief, for appellants.

*James L. Bundy, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *E. Allen Shepherd, Jr., Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

On 1 October 1969, James Cole and Ola Lucille Wilkins were jointly indicted by the Grand Jury for Prince George's County for violation of the narcotics laws on 18 August 1969. By an addendum to the indictment Cole was

informed that the State intended to prosecute him as a subsequent offender. On 16 October each filed a written plea of not guilty and elected a jury trial. They were jointly tried under the indictment before a jury in the Circuit Court for Prince George's County on 13 January 1970. Each was convicted of the unlawful control of heroin (2nd count). Cole then elected to have the court determine whether he was a subsequent offender and upon hearing the court determined that he was. Cole was sentenced to 5 years. Wilkins was sentenced to 3 years. Her sentence was suspended and she was placed on probation for a period of 3 years under conditions specified. They appeal, filing a joint brief.

# I

"DID THE LOWER COURT ERR IN ADMITTING INTO EVIDENCE THE SEARCH WARRANT AND AFFIDAVIT IN SUPPORT THEREOF, AS WELL AS ADMITTING INTO EVIDENCE ALL OF THE IRRELEVANT, UNRELATED AND PREJUDICIAL FACTS AND CIRCUMSTANCES CONCERNING THE POLICE SURVEILLANCE OF THE DWELLING IN QUESTION ON DAYS OTHER THAN THE DATE ON WHICH THE DEFENDANTS WERE CHARGED WITH POSSESSION AND CONTROL OF THE CAPSULE OF HEROIN?"

We made plain in *Price v. State,* 7 Md. App. 131 that the admissibility of evidence obtained by a search and seizure warrant claimed to be invalid was a matter exclusively for the trial court. In *Cleveland v. State,* 8 Md. App. 204, we affirmatively stated that when the court has found such evidence admissible the jury does not have the ultimate determination of whether or not the search and seizure was reasonable. We pointed out that Maryland Rule 729, applicable whenever property is claimed in a court to have been obtained by an unlawful search or seizure, § a, provides that if the case is being tried before a jury a hearing on a motion to suppress or objec-

tion to the introduction of such evidence shall be out of the presence of the jury, § d. If a motion to suppress is made and granted prior to trial, the evidence shall not be offered in evidence by the State at trial on the merits, § g 1. If such motion is made and denied prior to trial, the ruling is binding at trial, unless the trial judge in the exercise of his discretion grants a hearing *de novo* on the defendant's renewal of his motion, § g 2. But whether the trial judge accepts the pretrial ruling as binding or grants a *de novo* hearing on the point, if property is found by the court to have been lawfully obtained, it shall be submitted to the jury and no evidence pertaining to the legality of the seizure shall be presented to the jury. Thus, if the property was obtained under a search and seizure warrant, the affidavit on which the warrant was based does not go to the jury. 8 Md. App. at 208 and 213.[1] The pretrial ruling in any event is reviewable on appeal even though no further objection was made to the introduction of the evidence at trial, §§ f and g 2.

Appellants, claiming that property had been obtained by an unlawful search and seizure, moved prior to trial that evidence seized under a search and seizure warrant be suppressed because the warrant had not been issued on probable cause. The motion was heard and denied. When the indictment came on for trial the State in its opening statement told the jury without objection being made:

> "The charges that the Grand Jury have indicted these two people on are a result of police work that was conducted several days before that date, surveillance that was set up at the address 603 60th Place in Fairmount Heights, which is the residence of these two people. The surveillance showed that an informant went into the house on several occasions. He stated, the

---

1. Of course, the probable cause for the issuance of the warrant could only be ascertained from the four corners of the application. *Scarborough v. State*, 3 Md. App. 208.

informant told the police that Mr. Cole was selling heroin. Money was given to the informant and he did make a purchase, the purchase was field tested and it turned out to be heroin. Other items were sworn to in an application for a search warrant, a search warrant was issued by this Court, and I believe it was then Chief Judge J. Dudley Digges issued a search warrant. The search was conducted on the 18th and as a result of the search a narcotic, heroin, was found * * *."

The State called as its first witness Detective Elmer L. Snow of the Prince George's Police Department assigned to the Vice Squad, Narcotics Section. After eliciting the officer's experience in investigating violations of the narcotics laws, the State ascertained that he had been in the vicinity of 603 60th Place, the premises allegedly occupied by appellants, on 13 August 1969. The State asked him why he was there. Appellant objected and at the bench defense counsel said: "Your Honor, he can testify as to what he was doing here and things of that nature and how it came that he was called to be there, but why he was there, he has already testified that his job is to investigate narcotics violations. It makes it appear to the jury that he is there because a violation in fact occurred. He can testify as to how the complaints came into the office and how he came to be on the scene, but the question that is asked is too general." The objection was overruled and Snow said he was there to investigate a narcotic complaint. Thereafter without objection, Snow testified that on 13, 14 and 15 August 1969 he conducted a surveillance of the premises 603 60th Place. On 13 August he was there about 7 hours concealed in a telephone truck. On one occasion he saw a "Negroe male" knock on the door "for quite a while" and then walk around the side of the house out of the officer's sight. About 10 minutes later the same man came from the rear of the house and walked away. On another occasion he saw a "Negroe

male" whom he knew as Milton Nichols enter the rear door of the premises after knocking about 5 minutes. Later Nichols came out and walked away. On 14 August the officer saw Nichols enter the premises and later a man known to the officer as Leon "Gummy" Spriggs went into the premises. On 15 August the officer "contacted a confidential source * * * completely searched his person and requested that he go to 603 60th Place and purchase narcotics with money belonging to Prince George's County." The officer saw the "confidential source" enter the rear door of the premises and remain about 3 minutes. When he came out of the house he drove away in Snow's personal automobile. Snow followed him and about two blocks away the source stopped and gave Snow four capsules containing a white substance which proved to be heroin.

Snow was asked by the State to identify certain documents which had been marked for identification as State's Exhibit No. 1. He identified them as a return of a search warrant, a search warrant and the application for the warrant. He was the affiant. He was asked: "And the testimony that you have given us, is that contained in part of the affidavit?" and replied: "Yes, it is." He was then asked: "And there are other items, are there not, in the affidavit that you have not testified to here, is that right?" and he replied: "Yes, sir, there is." The State then offered the documents into evidence and appellant objected. The transcript discloses the following as occurring at a bench conference out of the hearing of the jury:

"THE COURT: What is your objection?
MR. WESLOCK (defense counsel) : This search warrant contains many references to many statements as to former convictions, one with reference to a former conviction of the defendant Cole.
THE COURT: But wasn't that on an additional attachment later?
MR. WESLOCK: Here it is on my copy of the

application for search warrant. It is down about in here. That is No. 1.

MR. SHEPHERD (Assistant State's Attorney) : I can't hear what he is saying because of this machine.

THE COURT: The application contains a statement of former implication.

MR. SHEPHERD: They are legitimate statements which purport probable cause upon which the warrant is based.

THE COURT: If you will stipulate, Mr. Weslock, it is based on probable cause we don't need to put that in.

MR. WESLOCK: I can't do that. I have got to go through the motion of objecting to the admission of the evidence in any event when it is proffered.

THE COURT: I am not sure that the question of a person's criminal record can be put into evidence in this manner.

MR. SHEPHERD: That is about the only thing. If we can somehow judicially strike that out, I have no objection. But we are entitled to that stipulation that there was probable cause or an exhibit that supports probable cause. We are entitled to either or.

THE COURT: He won't stipulate to that. So what we will do we will allow this into evidence with the understanding that before it is sent to the jury we will in some manner cover this part that would indicate the past record.

MR. SHEPHERD: Just the part concerning his criminal record.

MR. WESLOCK: May I continue on my objection? There are other items in here in addition to that, such as reference to known narcotics users and known convicted narcotics users who were observed going into the premises, the statements concerning the informant, and he is, I

assume, not here today to testify. Is he? Is that correct?

MR. SHEPHERD: No.

MR. WESLOCK: So it would have the same effect as hearsay evidence in this case.

THE COURT: I would think that the other part is all right except for the fact of the criminal record. We will delete that if it is shown to the jury. It may not even be necessary that the jury view it. That will be up to you.

MR. SHEPHERD: It is evidence. I would ask that all evidence be taken into the jury.

THE COURT: Then we will in some manner cover this up.

MR. SHEPHERD: That is fine.

THE COURT: We will advise the jury they can't see that part of it.

MR. SHEPHERD: My only point is that unless he is willing to stipulate we have probable cause to go in there we are entitled to show that we had probable cause. All of this other stuff supports that.

MR. WESLOCK: Of course it would be highly prejudicial.

THE COURT: We assume, Mr. Shepherd, you have researched this and find it is proper?

MR. SHEPHERD: Yes, sir. I have discussed it this morning with Mr. Marshall, as a matter of fact.

MR. WESLOCK: On that point we recently had a case —

THE COURT: We can go into this later, if you want to. But right now we are going to allow it.

(Whereupon, counsel returned to the trial tables and the following proceedings were had in open court in the hearing of the jury:)

MR. SHEPHERD: I offer into evidence State's Exhibit No. 1.

THE COURT: It will be received with the stip-

ulation that the Court made as to that part of it."

The application for the warrant, the warrant, and the return of the warrant were admitted in evidence.

The introduction of the application for the warrant was error. At a hearing prior to trial the judge presiding at the trial had ruled that the warrant was valid. We see nothing to show that the judge did not consider his pretrial ruling as binding and was granting a *de novo* hearing on the point. But even if he was hearing the question *de novo*, the question of probable cause was not for the jury. The Assistant State's Attorney was incorrect when he asserted that unless appellants stipulated there was probable cause for the issuance of the warrant, the State was entitled to place evidence relating to probable cause before the jury.

At the close of all the evidence, when motions for judgment of acquittal had been made and denied, the question of the search warrant affidavit came up again out of the jury's presence. The court requested the Clerk to cover up that place in each of the warrant and application which mentioned appellant's prior criminal record. Then the court said: "Gentlemen, as the Court understands it the question of probable cause as to whether or not the search warrant should have been issued is certainly not a question that is left to the jury." Defense counsel agreed but the Assistant State's Attorney said, "It is evidence." Of course, as we have pointed out, it was not evidence on the general issue, and the question of probable cause was not for the jury. The court then said that while it was evidence "for the purposes of the record," it did not see where it is necessary that the jury view it. "I would commend to you that you just don't give the jury No. 1 (the warrant, application and return) and protect it for the record." The Assistant State's Attorney said: "Fine. He has testified from it. Let it go at that. That way there can't be any question but that they won't know about that (the prior record)." Defense counsel said: "Right.

Because it is a risky business because they can always look under a sheet of paper and nobody would ever know." The matter came up again later. The transcript reads:

> "MR. WESLOCK (Defense counsel): The search warrant affidavit will not be submitted.
> THE COURT: It will not be.
> MR. SHEPHERD (Assistant State's Attorney): It is admitted but won't go to the jury.
> THE COURT: It is admitted but won't go to the jury.
> Mr. Clerk, that is an exhibit but don't let the jury have it when you give the others to them.
> * * *
> MR. SHEPHERD: I think since Exhibit 1 is in evidence I think the State would be permitted to read portions thereof.
> THE COURT: I think either one of you can, and read any part and don't give it to the jury and don't make the mistake of reading any of that record part. You can refer to it."

The court charged the jury. There were no exceptions. Counsel presented closing arguments which were not transcribed. No objections were made during the course of the arguments.

The posture of the matter is that it was error to admit the application for the search warrant into evidence at trial on the merits. It was, of course, properly admissible on the question of probable cause, which question was to be heard out of the jury's presence. But we think in the circumstances here that the error was harmless. The application was not viewed by the jury. There was no objection to the testimony of the affiant as to his observations on 13, 14 and 15 August. Rule 522 d 2. And while it would have been error for the State to read the application or portions of it to the jury in closing argument, we do not know that the State did so from the record before us, even though the court indicated it would so permit. And if it did so read to the jury there was no

objection made and in any event the question was not preserved on appeal.

We hold that any error relating to the admission of the search warrant and affidavit in support thereof does not require reversal of the judgments and that the propriety *vel non* of the introduction into evidence of the personal observations of the officer conducting the surveillance was not preserved for appellate review.

## II

"DID THE LOWER COURT ERR IN DENYING DEFENDANTS' MOTIONS FOR JUDGMENT OF ACQUITTAL MADE AT THE CLOSE OF THE STATE'S CASE AND AT THE CONCLUSION OF ALL OF THE EVIDENCE PRESENTED?"

The motion for judgment of acquittal made at the close of the evidence offered by the State is not before us. It was not granted and appellants withdrew it by offering evidence. Rule 755 b.

The warrant was executed on 18 August 1969. Appellants summarized the evidence in their brief. "The evidence in this case is basically uncontradicted. Appellant Cole owned the 3-story dwelling,[2] and had, at one time, occupied a bedroom on the second, or ground, floor. Appellant Wilkins was Cole's 'common law' wife, and lived in the same house. The third and basement floor of this house were rented to and occupied by other persons, and all of the people living at this address had free access by use of internal stairways to other parts of the house. During the period from Detective Snow's surveillance on August 13th through 15th to the actual execution of the

---

2. The rear door to the premises was to the second or ground or middle floor. Snow testified: "The bottom, the bottom floor, the basement is blocked off from the rest of the house. You can enter it—you can't go—you can get to the top floor by going in the front door. You could also get into the second floor by going through the front door. There is a stairway leading by the front door to the top floor * * * [The upstairs] is a self-contained unit which is a part of the main building."

Search Warrant on August 18th, the Appellant Cole was never seen coming in or going out of the house in question, and was seen near it only once, and on this occasion was on the sidewalk in front. The Appellant Wilkins had been seen in and about the house during the period of the surveillance, and was present on the day of the search of the [second or ground] floor. In addition to Wilkins, however, there were two unknown female and two unknown male Negroes on the [second] floor with her at the time the search was conducted. In addition there were tenants occupying the house in the basement and on the \* \* \* top floor. Defendant Cole was not present at the time of the search."

Detective Lester R. Rackey of the Prince George's County Police Department assisted in the search. He searched the middle or ground level floor. "In searching a bedroom area under the front of the head of the bed I found a piece of aluminum foil and the contents of this aluminum foil were two capsules of suspected heroin, a white powder in them. \* \* \* Immediately upon finding this piece of aluminum foil I unrolled it, observed the two capsules. I then ran a Marquis reagent field test on the contents of the two capsules. One proved affirmative and the other didn't show any opium derivatives or narcotics." Analysis later made by a United States Chemist confirmed that the capsule contained heroin. Rackey was asked exactly where he found the capsules. "Under the bed up near the front, the head part where the head would be. \* \* \* Just lying under the bed. \* \* \* Once I removed the mattress it was easy to observe the foil" in plain view. Without objection he said the room in which the narcotic was found was Cole's bedroom. Snow testified without objection that the contraband was found in Cole's bedroom. Asked how he could identify whose bedroom it was he said: "Well the bedroom had numerous papers, envelopes, addressed to Mr. James Cole in the dresser draws. Lying on top of the dresser was a red building permit in the name of Mr. Cole." The building permit was found on top of the dresser. "It was the one dresser

there." On cross-examination of Rackey, defense counsel asked what gave Rackey the impression the bedroom was that of Cole. The transcript reads:

"A. I had been there previously on another raid.
Q. To that house?
A. Yes, sir.
Q. And you are familiar with Mr. Cole's room as a result of that?
A. Yes, sir.
Q. Did you find that to be Mr. Cole's room at that earlier time?
A. Only from what Mr. Cole advised.
Q. At that time?
A. Yes, sir.
Q. How long ago was that?
A. That was June 28, 1968. The raid was at six a.m."

Cole called the Seat Pleasant Station after the raid. Snow told him there was a warrant for his arrest and requested him to come to the Station so the warrant could be executed. Cole did so and was arrested. "He stated that he had no knowledge of the heroin being in his bedroom."

Appellants adduced evidence tending to show that Ola Wilkins' daughter, Loretta M. Harrison, age 16 years, had been an occupant of the middle floor of the premises for a period prior to February 1969. At the time of the trial she said she occupied the basement apartment with her husband. She said she had last slept in the bedroom where the capsules were found in February 1969. She slept in there during the day. Her mother and Cole slept there at night. A boy named Michael Kelliebrew had given her two capsules in February 1969 to keep for him and she put them beside the bed. "It was a ash tray, a tall ash tray, and there was a cinderblock beside it and I laid it there." She never removed the capsules from that spot.

We think that the evidence was sufficient to go to the

jury on the question of whether appellants or either of them had control of heroin. It was for the jury to decide whether appellants had exclusive control of the bedroom. "It has been held that where one has exclusive possession of a home or apartment in which prohibited narcotics are found, it may be inferred, even in the absence of other incriminating evidence, that such person knew of the presence of the narcotics and had control of them * * *." *Davis and Green v. State,* 9 Md. App. 48, 52-53. The weight of the evidence and the credibility of the witnesses were for the jury. *Williams v. State,* 5 Md. App. 450.

We hold that the lower court did not err in denying the motion for judgment of acquittal made at the close of all the evidence.

### III

"DID THE LOWER COURT ERR IN FAILING TO DECLARE A MISTRIAL WHEN BOTH OF THE WITNESSES FOR THE STATE TESTIFIED THAT THE DEFENDANT COLE HAD PREVIOUSLY BEEN THE SUBJECT OF A PRIOR SEARCH AND SEIZURE AND HAD PREVIOUSLY BEEN ARRESTED?"

During the direct examination of Snow after it had been elicited that Cole had been arrested and after defense counsel had stipulated that Cole had been "advised of his rights," the State asked Snow what Cole had said. "He stated that he had no knowledge of the heroin being in his bedroom. He further stated that the charge was entirely wrong against him, that he had been previously arrested for * * *." Appellant objected and the objection was sustained. The transcript reads:

"(Whereupon, counsel approached the bench and the following proceedings were had out of the hearing of the jury:)
MR. WESLOCK (Defense counsel): Before it became clear what the witness was going to

state enough got out so as to highly prejudice
the defendant's case, James Cole. It is obvious
that the jury will conclude what he was going
to finish saying and I would respectfully move
on this basis for a mistrial based on a highly
prejudicial statement made by the witness.

THE COURT: The motion will be denied and
the jury will be warned about it.

(Whereupon, counsel returned to the trial tables
and the following proceedings were had in open
court in the hearing of the jury:)

THE COURT: Members of the jury, the defen-
dant objected to the statement of the witness as
follows: that he—referring to a statement made
to him by Mr. Cole—that he had been previously
arrested for—and that much got out before the
objection got in. We sustained the objection and
we are directing you members of the jury to dis-
regard that reference and disregard that state-
ment of the witness. You are to entirely dismiss
it from your minds. It has no bearing and is not
proper for you to consider that in this case."

In the circumstances we see no error compelling reversal.
See *Reeves v. State*, 3 Md. App. 195.

On cross-examination of Rackey defense counsel asked
the witness what gave him the impression the bedroom in
which the narcotics were found was Cole's bedroom. In
direct response to the question and additional questions
posed Rackey said he had been on the premises on another
raid and that he had found the room to be Cole's "from
what Mr. Cole advised," and that the raid was 6:00 A.M.
on 28 June 1968.[3] The following transpired at the bench:

"MR. WESLOCK (Defense counsel): It looks
like I got more than I bargained for.

THE COURT: It goes back to the old story. You
don't ask a question on cross-examination if you
don't know the answer. I know that is utterly
impossible —

---

3. The testimony is set out verbatim *supra*.

> MR. WESLOCK: Could we ask at this time that the jury be advised to disregard this?
>
> THE COURT: We think this is cross-examination and it came out on cross-examination. We don't think that is proper.
>
> MR. WESLOCK: It wasn't relative —
>
> THE COURT: It was responsive to the question.
>
> MR. WESLOCK: It was in no way relevant to the purpose of this proceeding.
>
> THE COURT: Well, but you asked the question and he gave you the answer, sir. It was certainly responsive to the question. We don't think it would be proper to—we can't control the answers that the witnesses give.
>
> MR. WESLOCK: Very well, Your Honor."

In the hearing of the jury defense counsel then again asked the witness the date of the prior raid and said: "All right. And during that period of time you just assumed that it remained the room that you thought it was, Mr. Cole's room?" Rackey replied, "Yes, sir." We cannot say that the lower court abused its discretion in not cautioning the jury to disregard testimony that appellant had brought out by his questions on cross-examination. We believe that the answers were responsive to the questions asked and note that the subject was pursued by appellant after the initial response that there had been a prior raid. We hold that there was no error requiring reversal of the judgment.

IV

> "DID THE LOWER COURT ERR IN REFUSING TO PERMIT A PRIVATE DETECTIVE TO TESTIFY CONCERNING CERTAIN DECLARATIONS AGAINST INTEREST MADE TO HIM BY A WITNESS WHO WAS UNAVAILABLE TO TESTIFY?"

Loretta M. Harrison, daughter of Ola Wilkins, testified that she had lived in the premises 603 60th Place for

six years. During that period the bedroom in question had been occupied by her mother and Cole until March 1969 and thereafter by her little sisters. She had also slept there during the day, the last time being in February 1969. In "about February" she had been given two capsules by a Michael Kelliebrew to keep for him. She did not know the name of them but "one was red and one was sort of white looking." She was shown the capsules found in the bedroom and said she had seen them in Kelliebrew's possession, that she then had them in her possession and that she had placed them in the bedroom. She was sure; "I remember the white ones but there was a red one." She was in the bedroom one day in February 1969 "combing my hair and my grandmother was coming, so I just put it down beside the bed. * * * It was an ash tray, a tall ash tray, and there was a cinderblock beside it and I laid it there." She never went back to get the capsules and never removed them from the spot where she put them. On cross-examination she was certain the capsules shown her in court were those given her by Kelliebrew.

Kelliebrew was called by appellant but refused to testify, invoking the 5th Amendment privilege.

Appellant then called Darrow Glaser and at the bench defense counsel said that "Mr. Glaser's testimony will be concerning an interview that he had with Mr. Kelliebrew at the penitentiary in Hagerstown, the particulars of that interview." Defense counsel made a proffer: "Mr. Glaser if allowed to testify, it is proffered would proffer that Mr. Kelliebrew first met Loretta Wilkins, now Harrison, about Labor Day of 1968. At that time Kelliebrew was dealing in narcotics, namely heroin and cocaine. He stated that he was pushing and snorted heroin but never mainlined or skin-popped and that he definitely was not a junky. * * * A most recent contact by Kelliebrew with Loretta would have been some time in February of 1969. Between Christmas of '68 and February of '69 Kelliebrew furnished Loretta with capsules of heroin and/or cocaine, and that is basically the summary of the conversation."

The lower court did not think that the testimony proffered was proper. It agreed with the State that the testimony was hearsay "because the witness is here and available and he elected not to testify," and that since Kelliebrew did not testify there was nothing as to him to impeach. The court also thought it was self-serving; "it is hearsay and self-serving." It held that Glaser was not "qualified to testify on the proffer that you have made."

There is no question but that the testimony proffered was hearsay. As testimony in court of a statement made out of court offered as an assertion to show the truth of matters asserted therein and thus resting for its value upon the credibility of the out-of-court asserter it was within the definition adopted by this court. *Quiles v. State,* 4 Md. App. 354, 358, citing *Frey v. State,* 3 Md. App. 38, 48, quoting McCormick, *Evidence* (1 Ed. 1954), § 225, p. 460. As such the testimony was inadmissible unless it came within one of the exceptions to the hearsay rule, and the exception for declarations against interest is the only one available.

"To satisfy this exception to the hearsay rule, two main requirements must be met: first, the declaration must state facts which are against the pecuniary or proprietary interest of the declarant or the making of the declaration itself must create evidence which would endanger his pocket-book if the statement were not true; second, the declarant must be unavailable at the time of trial." McCormick, *supra,* § 253, p. 546. McCormick feels that any reason why the declarant cannot be brought in at the trial should suffice to render him "unavailable," including "his successful claim of privilege," but he notes that "the holdings are checkered." *Id.,* § 257, p. 554. We feel that Kelliebrew's successful claim of privilege made him "unavailable" within the intent of the exception to the hearsay rule.[4]

---

4. In *Gaskins v. State,* 10 Md. App. 666, we held that a witness who steadfastly refuses to testify under the penalty of contempt is, in effect, "unavailable" as a witness. See *Tumminello v. State,* 10 Md. App. 612.

The question is whether a declaration against penal interest falls within the exception. The majority of other jurisdictions hold that it does not. They follow the *Sussex Peerage* case, 11 Cl. & F. 85, 8 Eng. Rep. 1034, in which the House of Lords in 1844 determined that a declaration confessing a crime committed by declarant is not receivable as a declaration against interest. 5 Wigmore, *Evidence* (3rd ed. 1940), § 1476; McCormick, *supra*, § 255, p. 549. The *Sussex Peerage* rule has been severely criticized by Wigmore and McCormick and "notably in Mr. Justice Holmes' brief and pointed dissent in *Donnelly v. United States*, 228 U. S. 243, at 277-278." [5] Both the A.L.I. *Model Code of Evidence* (1942) Rule 509 (1) and the *Uniform Rules of Evidence*, (1953) Rule 63 (10) specifically state that a declaration that will subject the declarant to criminal liability is a declaration against interest within the purview of the exception to the hearsay rule. But this jurisdiction recognizes the *Sussex Peerage* rule. *Munshower v. State*, 55 Md. 11; *Baehr v. State*, 136 Md. 128; *Brennan v. State*, 151 Md. 265; *Thomas v. State*, 186 Md. 446. But the *Brennan* and *Thomas* cases and *Brady v. State, supra*, applied exceptions to the rule or limitations upon it, resting in large measure upon concern for the trustworthiness of the declaration against interest offered. So in those cases it allowed the hearsay in evidence under certain conditions tending to show reliability. In *Brennan* the unusual conditions establishing reliability were spelled out in detail and those circumstances "greatly minimize, if they do not entirely eliminate, the possibility of any fraud or perjury regarding these declarations. Men do not commit suicide in order to assist a rival and comparative stranger to defend a bastardy charge, nor would the relatives of a suicide in such a case as this ordinarily conspire with this rival to perjure themselves in his defense." 151 Md. at 272. In *Thomas*, 186 Md. at 452, the Court enunciated three rules of admissibility of such hearsay:

---

5. *Brady v. State*, 226 Md. 422, 427.

"[W]e hold that where a witness has made a written confession that he committed the crime with which the defendant is charged, the defendant should be allowed to introduce the confession in evidence and question him in regard to the confession and the circumstances under which he made it. We further hold that where in a criminal case an officer has secured contradictory confessions from two different persons, the defense should be permitted to question him about both confessions and we further hold that such a confession by a third party is admissible unless it appears that there was some collusion in obtaining it."

In *Brady* the Court thought that Brady's undisclosed confession might have been usable under any of the three rules stated in *Thomas*. 226 Md. at 429.[6]

In the instant case we do not think that the reliability of the proffered declaration was supported by special circumstances within the purview of *Brennan, Thomas* or *Brady*. We find no safeguards present to justify the admission of the declaration. We feel that the general rule that declarations against the penal interest of the declarant are not receivable as a declaration against interest is here applicable. The proffered testimony was hearsay and without the declaration against interest exception. We hold it was not admissible and that the lower court did not err in refusing to admit it.

*Judgments affirmed; appellants to pay costs.*

---

6. It appears that the rules laid down in *Thomas* were merely dicta until they were specifically applied in *Brady*. In *Thomas* the declarants were before the court and the value of their declarations depended upon their reliability as witnesses. See 23 Md.L.R. 178-184.