QUINCY OLDEN WILLIAMS *v.*
STATE OF MARYLAND

[No. 84, September Term, 1973.]

*Decided October 24, 1973.*

The cause was argued before MOYLAN, POWERS and GILBERT, JJ.

*M. Michael Maslan* for appellant.

*George A. Eichhorn, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *John Lucas, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

MOYLAN, J., delivered the opinion of the Court.

The appellant, Quincy Olden Williams, was convicted in the Circuit Court for Baltimore County by Judge Kenneth C. Proctor, sitting without a jury, of 1) possession of marihuana with intent to distribute and 2) possession of heroin. Upon this appeal, he raises four contentions:

(1) That a comment by the judge during the course of the

trial indicated such a prejudgment of the appellant's guilt as to constitute reversible error;

(2) That he was denied the equal protection of the law in the imposition of sentence;

(3) That the trial court erroneously denied his motion for judgment of acquittal at the end of the State's case; and

(4) That the physical evidence should have been suppressed as the product of unconstitutional searches and seizures.

We dispose of the first three contentions summarily. We treat the fourth more fully.

### Judicial Prejudice

The appellant was one of four persons arrested and jointly indicted. One of the co-defendants, Joseph Edward Mateycik, entered a plea of guilty. The other three, including the appellant, proceeded to a joint trial. At the end of the State's case, co-defendant Steven Brockmeyer was granted his motion for acquittal. The appellant made a similar motion and it was denied. The remaining defendant, Edward Paul Dieumegarde, also moved for acquittal. As to the count charging possession of a sufficient amount of marihuana to indicate an intent to distribute, the motion was granted as to Dieumegarde. As to the count charging simple possession, the motion was denied. The exchange between Dieumegarde's counsel and Judge Proctor was as follows:

"(Mr. Mann) We are at the end of the State's case and I would like to make a motion for acquittal certainly concerning count number one, an intent to manufacture, distribute or dispense a controlled dangerous substance in a sufficient quantity.

(The Court) I'll grant the motion as to Dieumegarde on that.

(Mr. Mann) All right.

(The Court) In my judgment it's debatable as to whether it's a sufficient amount of Marihuana to have an intent. *In my judgment what happened,*

> *Williams was peddling* and this was purchased by Dieumegarde.
>
> (Mr. Mann) Well, you're overruling my motion on count two, of course, possession of Marihuana?
>
> (The Court) Yes." (Emphasis supplied)

The appellant urges upon us the proposition that Judge Proctor thus revealed that he had prejudged the appellant's guilt as a "peddler" of marihuana even before the appellant had had the opportunity to present a defense.

Notwithstanding the fact that the appellant neither entered objection at the time nor made a motion for a mistrial, we eschew reliance upon Maryland Rule 1085, because of our firm conviction that the appellant's proposition is totally without merit and that the trial judge's conduct was totally unoffending.

There was, of course, in the instant case no jury to be influenced by anything said in the exchange between the court and counsel. It is to avoid just such a possibility of inadvertent influencing that the trial judge generally, in a jury trial, excuses the jury from the courtroom during any period of extended legal argument. The trial judge himself, on the other hand, can never relinquish his responsibilities as judge, even when he plays the additional role of fact finder. He cannot isolate himself in one capacity from his required ratiocination in his other capacity. He is called upon to make judgment as to whether the State, at a midpoint in the trial, has established a *prima facie* case as to each and every defendant as to each and every count. He is called upon to decide whether each defendant need bear the burden and the risk of going ahead and presenting a defense and, if so, as to what charges. Such judgments are final when made in favor of the defense but are, by definition, only tentative rulings when made in favor of the State. The rulings, moreover, are not that the State, at that stage, has convinced the judge, sitting as a jury, of guilt beyond a reasonable doubt, but only that the State has presented legally sufficient evidence to permit such findings.

The appellant might just as well urge upon us that Judge

Proctor prejudged the case by denying the appellant's own motion for a judgment of acquittal; implicit in that ruling was precisely the same tentative appraisal of the facts as was made explicit in ruling upon the motion of Dieumegarde. To reach such tentative decisions, when appropriate motions are made, is not simply the prerogative of the trial judge, but, indeed, his bounden duty. The exercise of that duty in no way indicates that a defendant will be denied an impartial judgment when final deliberation is made by the judge as ultimate fact finder. The appellant's position that the fact finder's mind must remain a blank until the moment of formal decision is a psychological absurdity. Any fact finder, judge or jury, who is neither sleeping nor daydreaming, is continuously making appraisals and tentative judgments, subconsciously and consciously, throughout the shifting course of a trial and with every ebb and flow of testimony. All that is required is that the judicious mind remain ever open to change and that *final judgment* not be made until every weight is upon the scales.

### The Appellant's Sentence and
### Equal Protection

The appellant makes the bald insinuation that only racism could account for the fact that he, the lone black man among the four arrestees, was sentenced to a term of five years, whereas "all the white occupants were released on probation or acquitted." As to the co-defendant who was acquitted, no further comment is necessary. Vis-a-vis the remaining co-defendants, the appellant conveniently ignores that he was convicted of possession of a large quantity of marihuana, indicating an intent to distribute, whereas the other two were convicted of simple possession of small quantities of marihuana. The appellant conveniently ignores that the trial judge found him, as a matter of fact, to have been a peddler of marihuana, whereas the other two were found to be mere customer-consumers. The appellant conveniently ignores that he was additionally found guilty of possession of heroin, whereas the other two were not. The

appellant conveniently ignores that he had a prior criminal record, whereas the other two had not. To attribute the very natural disparity in sentencing to racial discrimination is rank opportunism. We find the contention utterly devoid of justification.

## The Denial of the Motion for a
## Judgment of Acquittal

The appellant claims that the trial judge was in error in denying his motion for a judgment of acquittal made at the close of the State's case. The easy answer to the contention is that, after the motion was denied, the appellant took the stand in his own defense. It is long settled that when an accused offers evidence, his motion for a judgment of acquittal made at the close of the State's case is treated as withdrawn. Maryland Rule 755 b; *Wilkins v. State*, 11 Md. App. 113, 273 A. 2d 236.

## The Search and Seizure

The search and seizure question presented by the appellant is more intriguing. At approximately 11:30 p.m. on April 10, 1972, the automobile in which he and his three companions were riding was stopped by Baltimore County Police Sergeant Billy R. Baker at Sollers Point Road and Yorkway in Dundalk. A brown paper bag, containing between one and two pounds of marihuana,[1] was observed by Sgt. Baker under the right rear seat of the automobile between the feet of the appellant. Immediately after the appellant was ordered out of the car, the bag was seized. The appellant and his companions were arrested and taken to the Dundalk Police Station. The appellant was there searched more thoroughly. A keycase was removed from his body which contained heroin. Both seizures are at issue.

We will look initially to the predicate for the seizure of the bag of marihuana. Sgt. Baker was on routine patrol at

---

1. "The Court: That's one of the biggest bags of Marihuana I've seen since we have had it here. The officer said it's a pound and it's closer to two pounds in my judgment."

between 11:20 and 11:30 p.m. He had received over his police radio an alert that a shooting had occurred at Gino's on Wise Avenue. The sergeant was stationed at Dundalk Avenue and Sollers Point Road, a short distance from Wise Avenue. The shooting at Gino's had occurred between an hour and an hour and one-half before. The police bulletin notified all cars to be on the lookout for a "dark automobile with chrome mag wheels." Armed with that information, Sgt. Baker observed a "black '62 Chevrolet with chrome mag wheels sitting on the Walters Shopping Center lot." He made a u-turn to follow the automobile and stopped it. He requested a back-up unit before approaching the stopped car. It developed that neither the automobile nor any of its occupants had been involved in the shooting at Gino's.

It is unnecessary for us to face the issue of whether Sgt. Baker had probable cause to search the automobile or had probable cause to arrest any of its occupants, and our forbearance intimates nothing in those regards. It is enough to hold that the similarity between the car he stopped and the car described in the police bulletin gave him at least "a reasonable suspicion" or "a reason to believe" that the car and its occupants may have been "connected with criminal activity." This was ample reason to "stop" the occupants of the automobile and to detain them "briefly for questioning" under the rationale of *Terry v. Ohio*, 392 U. S. 1, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968), and *Sibron v. New York*, 392 U. S. 40, 88 S. Ct. 1889, 20 L.Ed.2d 917 (1968). *Gibbs v. State*, 18 Md. App. 230, 306 A. 2d 587. Sgt. Baker was not acting upon "his inchoate and unparticularized suspicion or 'hunch' " but rather was "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed the] intrusion." *Terry, supra*, 392 U. S. at 21-22.

Initially it is to be noted that an occupant of an automobile is just as subject to a reasonable "stop" and to a reasonable "frisk" as is a pedestrian. *Adams v. Williams*, 407 U. S. 143, 92 S. Ct. 1921, 32 L.Ed.2d 612 (1972). And see *People v. Cassese*, 263 N.Y.S.2d 734. We believe that when Sgt. Baker spotted four individuals on a parking lot late at

night in an automobile which matched the description of one recently involved in a nearby "shooting," he came within the Supreme Court's- "recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." *Terry, supra,* at 392 U. S. 22. The "stop" was reasonable and, therefore, constitutional.

We turn our analysis to the accompanying "frisk." Fully recognizing "that the policeman must be able to articulate specific facts justifying both the 'stop' and, quite independently, the 'frisk' " and that "the latter does not follow inexorably from the former," *Gibbs, supra,* we are satisfied that an independent predicate was laid for the "frisk" in the case at bar. The interest undergirding the "frisk" was clearly set out in *Terry,* at 392 U. S. 23-24:

> "We are now concerned with more than the governmental interest in investigating crime; in addition, there is the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him. . . .
>
> . . . When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm."

Sgt. Baker clearly articulated that he was investigating a "shooting" when he stopped the automobile. His reasonable fear that the occupants of the automobile might well be armed was manifested by his appropriate caution in calling for "a back-up unit" and by his not proceeding forward to the stopped car until after that "back-up unit" was in place.

Pertinent is the analysis of Justice Harlan in his concurring. opinion in *Sibron, supra,* at 392 U. S. 74:

" . . . I think that, as in *Terry,* the right to frisk is automatic when an officer lawfully stops a person suspected of a crime whose nature creates a substantial likelihood that he is armed. . ."

And see *Williams v. State,* 7 Md. App. 204, 253 A. 2d 786. We are satisfied that Sgt. Baker had the right to "frisk" all occupants of the stopped automobile, including the appellant.

We must now examine whether the inspection of the brown paper bag spotted by Sgt. Baker on the rear floor of the automobile, and which seconds before had been between the feet of the appellant, falls within the constitutional contemplation of the *Terry-Sibron* "frisk." In the circumstances of this case, we hold that it does. A "frisk," of course, is only for the limited purpose of neutralizing weapons and not for the broader purpose of recovering evidence or of preventing its destruction. *Terry* was very emphatic, at 392 U. S. 25-26:

"A search for weapons in the absence of probable cause to arrest, however, must, like any other search, be strictly circumscribed by the exigencies which justify its initiation."

No "frisk" rationale could conceivably justify a search of the paper bag to discover suspected marihuana. In terms of present purpose, however, we are satisfied that that bag might well have concealed a handgun and that Sgt. Baker was bent primarily upon reducing all armaments available to the suspects he was stopping. The reason for the inspection of the bag, was, therefore, squarely within the limited purpose mandated by *Terry,* at 392 U. S. 26:

"Thus it must be limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby, and may realistically be characterized as something less

than a 'full' search, even though it remains a serious intrusion."

That the inspection of the bag for one purpose — the discovery of a possible weapon — fortuitously yielded an extraneous product — evidence of the possession of marihuana — does not offend the Fourth Amendment. *Cf. Warden v. Hayden*, 387 U. S. 294, 87 S. Ct. 1642, 18 L.Ed.2d 782 (1967); *Frazier v. Cupp*, 394 U. S. 731, 89 S. Ct. 1420, 22 L.Ed.2d 684 (1969); *Coolidge v. New Hampshire*, 403 U. S. 443, 91 S. Ct. 2022, 29 L.Ed.2d 564 (1971).

It is not enough, however, to validate the inspection of the bag in terms of its purpose. It must also be valid in terms of its geography — its range in space. In this regard, it may appropriately be measured against the more familiar standard of the search incident to a lawful arrest. See *Chimel v. California*, 395 U. S. 752, 89 S. Ct. 2034, 23 L.Ed.2d 685 (1969); *Brown v. State*, 15 Md. App. 584, 292 A. 2d 762; *Howell v. State*, 18 Md. App. 429, 306 A. 2d 554.

The "search incident" has, of course, as one of its two purposes — a purpose not shared by the "frisk" — the prevention of the destruction of accessible evidence by the arrestee. *Reifsnyder v. Lee*, 44 Iowa 101 (1876); *Holker v. Hennessey*, 141 Mo. 527, 42 S. W. 1090 (1897). It may therefore, in serving that purpose, be more intensive than the "frisk". As was recognized by *Terry*, at 392 U. S. 25:

> "The former [the search incident], although justified in part by the acknowledged necessity to protect the arresting officer from assault with a concealed weapon, . . . is also justified on other grounds, ibid., and can therefore involve a relatively extensive exploration of the person."

The second purpose of the "search incident," however, is shared by the "frisk." That purpose is to protect the officer by neutralizing all potentially available weapons. *Closson v. Morrison*, 47 N. H. 482 (1867). It follows ineluctably from that common purpose that the range in space of preventive police activity is coextensive in the "search incident"

situations and in the "frisk" situations. To serve the purpose giving birth to the exception in the first place, it is as necessary to the "frisk" as to the "search incident" to define the perimeter of permitted police activity as that area within "the lunge," "the grasp," "the reach" of the suspect — that area "which may fairly be deemed to be an extension of his person." *United States v. Rabinowitz,* 339 U. S. 56, 70 S. Ct. 430, 94 L. Ed. 653 (1950) (dissenting opinion by Frankfurter, J.); *Chimel v. California, supra; Brown v. State, supra.* Whether the police are arresting a suspect or are temporarily detaining him for questioning, the potential ability of the suspect to grab for a weapon is a constant factor. Although the "search incident" may be more intensive than the "frisk," the two will be, perforce, equally extensive.

Applying that standard, we hold that the bag on the floor of the automobile, which seconds before had been seen between the feet of this suspected holdup man and which still was within a few feet of him as he stood immediately outside the opened car door, fell within that perimeter of a reasonable "frisk." The "frisk" needs be as ranging in extent as the danger it was designed to prevent. The reason which gives birth to the exception defines its extent.

Of interest in this regard are three cases from New York. In *People v. Pugach,* 15 N.Y.2d 65, 204 N.E.2d 176, *cert. den.* 380 U. S. 936, the Court of Appeals of New York held that a briefcase being carried by a suspect was within the ambit of an authorized "frisk," at 204 N.E.2d 178:

> "The fact that the loaded gun was found concealed in the briefcase, rather than in a pocket of defendant's clothing, affords no ground for saying that this 'frisk' was in reality a constitutionally protected search. The loaded firearm concealed in the briefcase carried in the hands of the defendant was in the language of the statute 'concealed upon his person'."

In *People v. Cassese,* 263 N.Y.S.2d 734, the court held that where a policeman stopped an automobile in the early hours

of the morning and ordered its three occupants to alight, his otherwise unquestioned right to "frisk" extended, under those circumstances, to the automobile as well as to the physical persons of the suspects. The court said, at 737:

> "Even without arresting the defendants at that hour in the morning on a public street, the police had the right to momentarily detain, question and 'frisk' them. . . . Such 'frisk', under the facts in this case, could lawfully extend to the automobile."

In *People v. Bowles*, 289 N.Y.S.2d 526, the police, at 4:45 a.m., went to the home of a suspect in an armed robbery case. They found the suspect in bed. They "frisked" his trousers, which were lying on the floor nearby. They recovered a razor. In holding the "frisk" of the trousers reasonable, even though they were not literally on the legs of the suspect, the court said, at 528-529:

> "Here the detectives, based on the victim's identification and the torn money on the floor, had abundant cause to suspect that appellant was guilty of armed robbery and most importantly that he still might possess the razor with which he had slashed his victim. The detective testified that he went through the trousers to find the razor. Under the circumstances of this case and particularly since the officers planned to take him to the hospital for identification, the search for the razor was legally conducted. . . . It would have been perilous to permit the suspect to put his trousers on and thus permit him access to a dangerous weapon. Accordingly, we find the search was justified and reasonable and that the fruits thereof could be properly introduced into evidence."

When, in the case at bar, the legitimate "frisk" of the paper bag for a possible weapon fortuitously revealed marihuana, probable cause thereby emerged for the warrantless arrest of the appellant for the possession of said marihuana. His subsequent, more intensive station house

216

search, which revealed the incriminating heroin, was a routine incident of that lawful arrest. *Chimel v. California, supra; Brown v. State, supra.*

*Judgments affirmed.*