FRANKIE LEE ASKINS *v.* STATE OF MARYLAND

[No. 252, September Term, 1971.]

*Decided December 21, 1971.*

The cause was argued before ANDERSON, ORTH and CARTER, JJ.

*Blaine L. Gilbert* for appellant.

*Donald R. Stutman, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City,* and *Sandra A. O'Connor, Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ANDERSON, J., delivered the opinion of the Court.

The appellant, Frankie Lee Askins, was convicted in the Criminal Court of Baltimore on March 24, 1971, in a jury trial, Judge James W. Murphy presiding, of murder in the first degree, without capital punishment, and attempted robbery with a deadly weapon. Under the murder conviction, the appellant was sentenced to serve the balance of his natural life under the jurisdiction of the Department of Correctional Services. The appellant was also sentenced to a concurrent term of fifteen (15) years for the conviction of attempted robbery with a deadly weapon.

On this appeal, the appellant contends that the trial court erred in permitting a witness to refresh his recollection from a memorandum without first requiring the State to lay a foundation for the use of the memorandum. At trial the evidence produced by the State showed that on June 2, 1970, just after midnight, Bernard Wesley Mitchell was shot and killed with a shotgun in the 3400 block of Walbrook Avenue in Baltimore. Several coins of United States currency were found near the body. Through a witness, Joseph A. Johnson, the State attempted to show that the appellant had made an admis-

sion to Johnson that he had shot Mitchell while attempting to rob the deceased.

The pertinent part of Mr. Johnson's testimony is as follows:

BY MRS. O'CONNOR (Assistant State's Attorney)

"Q. Now, did there come a time when you talked to Mr. Askins?

A. Yes.

"Q. Where did this conversation take place?

A. In the bathroom.

"Q. Who else was there, if anybody?

A. Just me and Frankie.

"Q. What were you all doing? Was this in the bathroom or bedroom?

A. Bathroom.

"Q. What were you all doing in there?

A. Drinking.

"Q. What were you drinking?

A. Wine.

"Q. Who had bought the wine?

A. I did.

"Q. What, if any, conversation did you have with him in the bathroom?

MR. McALLISTER: Objection.

THE COURT: Overruled.

THE WITNESS: "Well, we were just talking and then he said that he killed a man. So I asked him did he mean the man in the junction, and he said, 'yeah', and then after that I just changed the conversation."

BY MRS. O'CONNOR:

"Q. Now, what was his condition when he was talking to you? Was there anything unusual about his condition?

A. Yes.

"Q. What was that?

A. He was drunk.

"Q. Did you remain in the bathroom drinking wine?

A. We stayed there about another half hour and then some other people started coming in. So, we took the bottle and went into the room and let them into the bathroom.

"Q. When you got into the bedroom, what, if any, conversation did you have in there?

A. We was still talking about just—I don't remember what the whole conversation was, I don't remember nothing specific about the conversation.

"Q. Now, on the early morning hours of June 2nd, what, if anything, else did Mr. Askins have a conversation with you about?

MR. McALLISTER: Objection.

THE COURT: Overruled.

THE WITNESS: "We was in the bedroom and he had this shotgun and he was talking about it."

BY MRS. O'CONNOR:

"Q. What was he saying?

A. He was just showing me the shotgun and just showed it to me and I told him, why didn't he take it and put it up because there were children in the house and he might forget it.

"Q. What else did he say to you?

A. That was it. He just walked out of the room and that was the last time I saw him.

After Johnson testified as to the conversation between himself and the appellant in the bathroom, the State then asked the witness:

"Q. Mr. Johnson, did you give a statement to the police on June the 2nd, 1970?

MR. McALLISTER: I object to this, your Honor, unless she intends to impeach her own witness.

THE COURT: I'll sustain the objection.

MRS. O'CONNOR: May I approach the Bench, your Honor?

THE COURT: Yes.

(Thereupon the following discussion took place at the Bench)

MRS. O'CONNOR: Your Honor, I intend to give the statement to the witness to refresh his memory as to what he told the police on that day. I would quote the *Holiday* case as being on point.

THE COURT: What is the Holiday case?

MRS. O'CONNOR: I don't have the citation.

THE COURT: Very well. Please return to your tables . . .

(Whereupon the attorneys returned to their respective trial tables.)

THE COURT: We are going to take about a five-minute recess. The jury may retire to the jury room. I have to admonish you, please do not discuss this case among yourselves until you are finally given the case for your consideration. You may retire to the jury room. It's only going to take about five minutes or so.

(Whereupon the jury was excused.)

THE COURT: Mr. Johnson, you are under oath, so please do not discuss anything

during the recess, do you understand?

THE WITNESS: Yes.

(Whereupon a five-minute recess was taken.)

(Whereupon Court resumed.)

(Whereupon the jury returned to the courtroom.)

THE COURT: Mr. McAllister, I'll overrule your objection to the last question. Will you ask the question again, Mrs. O'Connor.

BY MRS. O'CONNOR:

"Q. Mr. Johnson, you did give a statement to the police on the 6th of June, 1970, is that correct?

A. Yes.

"Q. This was given in the Homicide office and taken by Detective Herman Ingram and Detective Walter Sheppard, is that correct?

A. Yes.

"Q. And the statement was given approximately four days after the shooting at Walbrook Junction, is that correct, the 6th of June?

A. Yes.

"Q. And would your memory be better then as to the events of June the 2nd or today?

MR. McALLISTER: Of course, I object.

THE COURT: I'll sustain the objection to that question.

BY MRS. O'CONNOR:

"Q. Mr. Johnson, I'm going to show you a five page typewritten statement and ask you if on the fifth page if that is your signature?

A. Yes.

708

"Q. Now, I'll ask you please to read these five pages as initialed by you on each and every page as you are sitting there now.

A. (Witness so complied.)

"Q. Now, Mr. Johnson, would you please tell the jury what, if any, conversation you and Mr. Askins had in the bathroom on the morning of June the 2nd?

MR. McALLISTER: Objection. The question has been asked and answered, your Honor.

THE COURT: Are you referring to the bathroom?

MRS. O'CONNOR: Yes.

THE COURT: I'll overrule the objection. Did you have any further conversation besides that which you have already testified to?

THE WITNESS: What I told in that statement.

THE COURT: Has the statement refreshed your recollection concerning the conversation?

THE WITNESS: Yes.

THE COURT: All right, then, ask the question, Mrs. O'Connor.

BY MRS. O'CONNOR:

"Q. Mr. Johnson, what other conversations did you and Mr. Askins have on the morning of June 2nd?

A. You want me to start at first?

"Q. Yes.

A. He said that. He said that he had to kill the man, and I said, 'Do you mean the one up in the Junction?' He said, 'Yeah', and then—and then he said that Sylvia Dorsey went to the bar and picked him up and brought him around to the apartment building and him and Gene Morris

was supposed to rob him and then the man put—when the man got mad at him, he put his hand in his pocket. When Frank pointed the gun at him the man put his hand in his pocket and threw some change on the ground and told him, "If you want it, there it is', and then he put his hand back in his pocket and he said, 'You better hope your gun is loaded because mine is', and Frank said that's when he shot him.

"Q. Did you see Mr. Askins after that morning of June the 2nd?

A. Not until the 1st of July.

"Q. When you left Goldie Jackson's that night, do you know where Mr. Askins was?

A. No.

"Q. What time, if you remember, did Mr. Askins leave Goldie's house?

A. I don't know. He took the gun out of the bedroom and went downstairs and then that's when I got the other two girls and we just walked on out the front door I didn't see him any more."

\* \* \*

The standards for the admission of a memorandum into evidence as past recollection recorded and those for the use of a memorandum to revive present recollection differ. The former is an exception to the hearsay rule where the memorandum is actually admitted into evidence as substantive evidence. Unfortunately, some courts have tended to lump the two together under the heading of "refreshing recollection" and have applied the same standards to both. However, the foundation necessary to use a memorandum to revive present recollection differs from that for the use of past recollection recorded. Past recollection recorded is where "a witness, who is

either devoid of a present recollection or possessed of an imperfect present recollection, desires to use a past recollection. This he proposes to do by employing some record of his past recollection." *Wigmore on Evidence* (3rd Ed.), Sec. 734. The authorities are in general agreement, as to past recollection recorded, that to introduce the memorandum into evidence there must be a showing that the witness identifies the memorandum as made immediately after or contemporaneously with the event and that the memorandum is a correct statement of those facts which the witness recorded. *Wigmore, supra,* Secs. 734-747; *Hall v. State,* 223 Md. 158, 176; 125 A.L.R. 3; 82 A.L.R.2d 465. Stated succinctly, in order to introduce past recollection recorded, the general rule is that it is necessary to adduce from the witness "(a) that he at one time had personal knowledge of the facts, (b) that the writing was, when made, an accurate record of the event, and (c) that after seeing the writing, he has not sufficient present independent recollection of the facts to testify accurately in regard thereto." *Kinsey v. Arizona,* 49 Ariz. 201, 65 P. 2d 1141 at 1148, cited with approval in *Hall v. State, supra,* at 173.

Present recollection revived, on the other hand, is the use by a witness of some writing or other object to refresh his recollection so that he may testify about past events from present recollection. *Wigmore, supra,* Sec. 758; *McCormick on Evidence,* Sec. 9. In the instant case, it is clear we are dealing with present recollection revived. Mr. Johnson, after reading the statement, testified as to what he presently remembered about past events. Further, the statement was never introduced into evidence. Generally, the authorities agree that none of the limiting rules for past recollection recorded have any bearing on present recollection revived and that any writing whatever is eligible for use. On the other hand, the authorities are in agreement that in certain circumstances the expedients for stimulating recollection may be so misused that the witness may put before the court

that which purports to be, but is not in fact, his recollection and knowledge and that, therefore, any writing whatever, in the circumstances, may become improper. *Wigmore, supra,* Sec. 758. *McCormick, supra,* Sec. 9. Although no hard and fast rule can be laid down for invariable application, the predominant view today seems to be that within the sound discretion of the trial judge any memorandum or other object may be used as a stimulus to present memory, without restriction by rule as to authorship, guarantee of correctness, or time of making. *Kramer v. Commissioner of Internal Revenue,* 389 F. 2d 236, 238 (1968) ; *McCormick, supra,* Sec. 9 at 16 and 17. There have been numerous Maryland decisions in which the writings were held to be properly used under the circumstances. See, e.g., *Miller v. State,* 251 Md. 362; *Scott v. State,* 1 Md. App. 481; *Hubbard v. State,* 2 Md. App. 364.

We cannot find that the trial judge abused the wide discretion he has in the conduct of a trial in which he presides by permitting the witness to refresh his memory from the memorandum in question. *Stewart v. State,* 4 Md. App. 565; *Gerstein v. State,* 10 Md App. 322.[1]

*Judgments affirmed.*

---

1. *Meyerson v. State,* 181 Md. 105, relied upon by the appellant, is not apposite to the facts of this case.