## THOMAS N. WILSON, JR. *v.* STATE OF MARYLAND

[No. 401, September Term, 1973.]

*Decided February 27, 1974.*

The cause was argued before POWERS, DAVIDSON and MOORE, JJ.

*William H. Murphy, Jr.,* for appellant.

*Mary Elizabeth Kurz, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Milton B. Allen, State's Attorney for Baltimore City, Michael Mitchell* and *Barbara Daly, Assistant State's Attorneys for Baltimore City,* on the brief, for appellee.

MOORE, J., delivered the opinion of the Court.

Convicted in a jury trial of second degree murder and sentenced to a term of 15 years, appellant, Thomas N. Wilson, Jr., contends (1) that the trial court's expressions of incredulity during the testimony of appellant's mother constituted reversible error, (2) that the testimony of a defense witness that on the night of the shooting the decedent asked him for a gun was improperly excluded, (3) that the sworn affidavits given to the police by two prosecution witnesses, called as the court's witnesses, were improperly received and the court then erred in failing to instruct the jury on their limited use; and (4) that at the hearing on appellant's motion for a new trial the court erred in refusing to consider the results of polygraph examinations, made after the conclusion of the trial, of appellant and his mother, as well as the testimony of the polygraph examiner, and in refusing to permit appellant to lay a foundation for such testimony.

We conclude that the third assignment of error must be sustained, and for this reason alone the conviction must be reversed and the case remanded for a new trial. We do, however, also consider appellant's other contentions for the guidance of the trial court on remand.

Appellant, age 21, shot and killed a neighborhood acquaintance, age 20, after an argument which took place on the street in July, 1972, in the 2600 block of West Forest Park Avenue in Baltimore at about 10:30 in the evening. The weapon used was his father's single barrel hunting rifle which appellant obtained from his parents' bedroom after an exchange of angry words between him and the victim. The theory of the defense was that the deceased was in possession of a gun and that the appellant, warned by his mother as they were leaving the scene of the confrontation, wheeled and ducked and fired at his antagonist, killing in self-defense.

I

With respect to the third assignment of error, the record discloses that on the day of trial the State presented a

written motion requesting that the court call, as its own witnesses, three young men, eyewitnesses to the shooting, on the ground that both the witnesses and their parents had been intimidated, specifying instances of such intimidation, that the witnesses were "terrified" and the State could not vouch for their veracity. Over objection, the motion was granted.[1]

The court thereafter called the three witnesses, Alfred Tuck, 24, Mark Craig, 20, and Winslow Holman, 18. After "direct" examination by the court, the three were then cross-examined by the State and the defense, in that order. During the State's cross-examination of Tuck and Craig, the court received in evidence, over objection by appellant's trial counsel, affidavits given by them to the investigating police officers during the early morning hours of July 11, 1972, following the shooting on the evening of July 10. Holman's affidavit was not offered.

Tuck's affidavit contains the following statement in response to a police officer's question as to what he knew about the shooting:

> "A. Yes, i was in the area of Forrest Park Bur-
> leith st., visiting some friends, and i saw Joe and
> Tommy argueing in the street. Tommy said wait
> a minute, and went into his house on forrest Park
> then came back several minutes later with a gun,
> i don't know if it was a rifle or shotgun, and he
> told Joe to 'go ahead', and Joe said 'if your going
> to shoot me, you better kill me', then Tommy fired
> and Joe fell to the street and i ran to tell Joe's
> Parants and thats it." (as in the original)

During his direct examination by the court, Tuck

---

1. The authority of a trial judge in the exercise of his sound discretion to call and examine witnesses of his own accord under appropriate circumstances is not at issue here and is well established, 67 A.L.R.2d 538, 540; 2 Wharton, *Criminal Evidence* § 704 (12th ed. 1958); 42 Harv. L. Rev. 445 (1929), as is the rule that witnesses called by the court are subject to cross-examination by both the prosecution and the defense. 67 A.L.R.2d, *supra*, 551; 3A Wigmore, *Evidence* §§ 910, 918 (Chadbourn rev. 1970).

responded to a question as to "what happened" when appellant returned to the street:

"It was a shotgun. I mean, whatever it was it fired."

Then:

"Q. Did you see it or hear it?

A. I heard it.

Q. Who had the gun?

A. I think it was Tommy."

Upon objection, the court struck the last answer, cautioning the witness and asking the further question: "What did you see? " To this. the witness replied:

"I'm not sure what I see [sic], Your Honor. It could have been a shot fired. I took off with everybody else."

* * *

"Q. Now, prior to hearing the shot, did you hear anybody say anything?

A. No, I didn't. I didn't pay that much attention, sir."

The State, at the outset of its cross-examination of Mr. Tuck, had him identify his affidavit, including his signature and verification. The testimony then continued in part:

"Q. But you did see this defendant with the gun did you not?

A. Yes, at the time he returned.

* * *

Q. Well, at that time, that was the only gun you saw?

A. Right. That was, at the time.

* * *

Q. Those were the only two arguing in the street at that time, were they not?

A. Right. Right.

Q. Didn't you also tell the police officer that the deceased, Mr. Harris, told the defendant to go ahead and said, 'If you're going to shoot me, you had better kill me'?"

After a somewhat evasive response, the State pressed the witness:

"Q. Well, what exactly did he say?

A. He said something about, 'If you're going to shoot, shoot.' I didn't say that part about killing. I don't know. 'Shoot, if you're going to shoot.' "

On cross-examination by defense counsel:

"Q. If [the decedent had a gun in his possession], you didn't see it, is that it?

A. Right, sir."

And on further cross-examination by the State:

"Q. You saw the shots fired by the defendant that hit Joe Harris, did you not?

A. What I was saying, what I'm saying, is that I was in conference with Eugene Banks, and my back was turned. I heard the shot fired, and we turned around, and we seen the defendant [decedent] laying on the ground.

\* \* \*

"Q. But at that time, that morning after what happened. you had a fresher recollection of what, in fact, did happen, did you not?

A. I was still puzzled about certain things about what happened.

Q. It's also been some time, has it not?

A Yes it has.

Q. Since this happened?

A. Yes, it is.

MR. MITCHELL: No further questions."

The State thereupon offered the witness' affidavit in evidence. In response to vigorous opposition by the defense, the court stated in part:

"... it's even better than oral testimony It's signed and written and it's within this court's discretion, to allow that not as substantive evidence, but to impeach the witness, and the jury, of course, in determining whether or not to believe his testimony on the witness stand, has the right to consider the fact that he's made to a large degree an inconsistent statement on another occasion. So, I'll overrule your objection."

When the witness Mark Craig testified, he was also interrogated by the court in the first instance and was thereafter cross-examined by the State and by defense counsel. He told the court that he had observed the two men arguing and appellant leave and return with a gun. He continued:

"A. ... Well, next thing I know, the gun just went off somehow.

Q. Did you hear it?

A. Yes.

Q. And were you looking in the direction of where it went off?

A. I wasn't looking in the direction, but I saw where it went off.

Q. I see. Then you looked in that direction. What did you see?

* * *

A. Then, like I said, I heard a shot, and I turned around, and Arthur was laying on the ground. ... Then the defendant went back down the street."

Questioned by the State, Craig verified his signature on the affidavit given to the police. He was asked if it accurately described what had happened that evening and he replied, "As far as I can remember, right." The testimony continued in pertinent part:

"Q. They started arguing as if they were going to fight or something? Do you remember saying that?

A. Well, yes.

\* \* \*

Q. ... Do you remember saying that Tommy walked away from Bunky, and said, 'I'll be right back ... [and] came back with either a rifle or shotgun?

A. Yes.

\* \* \*

Q. Do you remember also saying ... to the police officers at the time that Arthur · Harris said, 'Tommy, if you shoot me, you had better kill me?

A. Yes.

\* \* \*

**Q. Then you remember saying that then Tommy** shot Bunky and ran down the street, and jumped into his car, and drove off in it?

A. Yes. There was a shot, and Tommy was the only one that I could see with a gun, was Tommy, and there was a shot."

On cross-examination by the defense Craig was pressed as to whether the words imputed to the decedent were not suggested by the detective, but answered, after initial hesitation: "Those words were mine."

"MR. FREEDMAN: ... I would like you to explain to this jury how come those words, that quote of Bunky's, is in your statement exactly like the one in Tuck's statement? Can you or can't you explain that?

THE WITNESS: Yes, I can, because that's what he was saying."

At the conclusion of Craig's testimony, the State offered his affidavit and it too was received, over objection, the court

overruling the objection for the "same reason" as earlier stated.

The pertinent passage in Craig's affidavit was as follows:

"I got up off the car and walked up to them to see what they were arguing about. Tommy walked away from Bunky and said 'I'll be right back.' He left. Tommy went into his house and came back with a rifle or shotgun. It had only one barrell. Tommy said something to Bunky and they started arguing again. Bunky did not move because Tommy had the gun. Bunky said 'Tommy if you shot me you better kill me.' . . . Tommy and Bunky kept arguing. Then Tommy shot Bunky, ran down the Street jumped into his car and drove off in it. He drove down Forrest Park Ave." (as in the original)

It is apparent from the trial court's explanation for overruling the objection that the court relied upon the rules of evidence relating to the use of prior inconsistent statements for purposes of impeachment in receiving the affidavits of Tuck and Craig. Appellant in his brief also places principal reliance upon the law limiting the use of such statements, citing *Green v. State*, 243 Md. 154, 220 A. 2d 544 (1966) and *Vandergrift v. State*, 13 Md. App. 277, 282 A. 2d 528 (1971), and argues that the lower court committed reversible error in failing to instruct the jury on their limited use.

The distillation of these and other Maryland cases which are concerned with the subject of surprise is that while evidence of extrajudicial statements made by a witness not a party and whose declarations are not binding as admissions is admissible to contradict him and therefore afford the party calling him an opportunity to show why he called him, such statements are not probative evidence on the merits and are not to be treated as having any substantive or independent testimonial value.[2]

---

2. This is the orthodox view, adopted in the great majority of jurisdictions including Maryland. *See* 133 A. L. R. 1454. In *West v. Belle Isle Cab Co.,* 203 Md. 244, 100 A. 2d 17 (1953), the Court of Appeals

The record before us discloses that indeed no instruction as to the limited use of the statements for the former purpose was given by the court. It also discloses that appellant requested no such instruction nor did he object to the failure of the court to so instruct. Were we in fact confronted with a situation involving the use of prior inconsistent statements to impeach a witness, our present inquiry would have to be whether this Court should take cognizance of a plain error in instructions, assumed to be material to the rights of the accused, such error being, however, one of omission and not one of commission. *Brown v. State*, 14 Md. App. 415, 287 A. 2d 62 (1972); *Taylor v. State*, 17 Md. App. 41, 299 A. 2d 841 (1973).

That question does not present itself, however, on the facts before us because the law relating to the use of prior inconsistent statements is inapplicable here. Tuck's in-court testimony, as indicated earlier, was that he saw appellant and no one else with a gun, that appellant and the decedent were engaged in argument, that the decedent told appellant, "Shoot, if you are going to shoot," and that although he did not see the shot fired because his back was turned, he "heard the shot fired" and when he turned around saw the decedent lying on the ground. The version of the decedent's remark insisted upon by Tuck in court was slightly at variance with the version in his affidavit, "If your going to shoot me, you better kill me," and his insistence in court that he did not see the shot fired, but only heard it, was arguably at variance with his statement to the police, "Tommy fired and Joe fell

acknowledged Wigmore's criticism of the view but said, "[T]his Court has joined in the universality of its acceptance." At 253. The minority view, permitting the substantive use of prior inconsistent statements on the theory that the usual dangers of hearsay are largely nonexistent where the witness testifies at trial, has been urged by most legal commentators, finds expression in current proposals to codify the law of evidence and has been adopted in some jurisdictions, most notably in several federal cases arising in the Second Circuit. *See U. S. v. DeSisto*, 329 F. 2d 929 (2d Cir. 1964); *Taylor v. Baltimore & Ohio Railroad Co.*, 344 F. 2d 281, 283 (2d Cir. 1965), cert. den. 382 U. S. 831; *see also California v. Green*, 399 U. S. 149 (1970) where, without having "to decide which of these positions, purely as a matter of the law of evidence, is the sounder," the Supreme Court held that a defendant's constitutional right of confrontation was not "necessarily inconsistent" with California's decision to change its hearsay rules to reflect the minority view.

to the street"; arguably, because the latter is also construable as a mere inference by Tuck from observations which he verified in his testimony in court. The test of what amounts to a self-contradiction is well stated in 3A Wigmore, *Evidence* § 1040 (Chadbourn rev. 1970) where it is said:

> "As a general principle, it is to be understood that this inconsistency is to be determined, not by individual words or phrases alone, but by the *whole impression or the effect* of what has been said or done." (Emphasis in original)

Wigmore quotes with approval *United States v. Holmes*, 1 Cliff. 98, 116 (1858), as follows:

> "Directness, in the technical sense, is not necessary to give the evidence that character, nor is it necessary that the contradiction should be complete and entire, in order to admit the opposing testimony."

Despite the lower court's conclusion that self-contradiction had been shown with respect to Tuck's testimony, we are not persuaded that this was so as respects either the details of his testimony or its "whole impression or . . . effect."

Nor do we find inconsistency with respect to the testimony of Craig. In court, Craig confirmed that his affidavit accurately described the events of the shooting "as far as [he] remember[ed]." He testified that of the two disputants only appellant had a gun, that the decedent told appellant "Tommy, if you shoot me, you had better kill me," and that *based on his inference from his observations* he had indeed told the police that appellant shot the decedent before jumping in his car and driving off. In no material respect whatever, therefore, did Craig contradict the statements made in his affidavit but, on the contrary, verified or explained them in court to the full and evident satisfaction of the State. Indeed the only impeachment that took place in court was the effort of defense counsel to discredit the affidavit itself.

Putting the best face on the State's use of Craig's affidavit, as well as, we think, of Tuck's, it appears that we are confronted with a situation considerably more closely akin to that of a party using a prior statement to refresh a witness' present recollection. In Underhill, *Criminal Evidence* § 499 (5th ed. 1956), it is said:

> "It sometimes happens that state witnesses, who have given written statements, become unwilling, forgetful, or evasive when called upon to testify. In such case the prosecuting attorney, sometimes claiming surprise, may call the witness' attention to the prior statement, not so much for purposes of impeachment but to refresh the witness' recollection."

Similarly, Wharton, *Criminal Evidence* § 849 (12th ed. 1955), states:

> "The court may, in its discretion, permit a party to put questions to his witness on direct examination to refresh his recollection, by directing his attention to a particular matter or asking questions relating to prior statements or prior testimony, or by reading to him his prior testimony or portions therefrom, especially when it appears that the witness is unfriendly toward the party calling him, or is trying to evade the questions put to him." [3]

Although here the State was engaged not in direct examination but in cross-examination of Tuck and Craig, cross-examination to refresh a witness' recollection on the

---

**3.** In *U. S. v. Socony-Vacuum Oil Co.*, 310 U. S. 150 (1940), the Supreme Court, in a majority opinion by Mr. Justice Douglas, found no reversible error in the government's use of grand jury testimony in some 90 instances to refresh the recollection of witnesses who were characterized by "obvious hostility and evasiveness," where the trial court was "alert to stop impeachment" and "only in about one-sixth of the instances was any inconsistency in testimony developed. In the balance, recollection was either not refreshed or the testimony which had been given was wholly or substantially consistent with the previous grand jury testimony." 310 U. S. 150, at 231, 232.

basis of prior statements may be permitted. Its propriety lies largely within the sound discretion of the trial judge. 3 Wigmore, *supra*, § 764; *see United States v. Baratta*, 397 F. 2d 215 (1968); *Young v. United States*, 214 F. 2d 232 (1954).

Yet from the quite legitimate (and here successful) use of the prior statements of Tuck and Craig by the State to refresh their memory or "awaken their conscience," *People v. Malston*, 258 N.E.2d 362, 365 (Ill. 1970), the State can take no comfort, for the affidavits should not have been received in evidence over appellant's objection. As stated in Wharton, *Criminal Evidence* § 416 (13th ed. 1973): "Since it is the witness' present recollection, not the memorandum, which is the evidence, the memorandum itself is not admissible, nor may the contents thereof be read to the jury. But such a memorandum is admissible in evidence when introduced by opposing counsel." And as Wigmore has it: "That the *offering party* has not the right to treat it as evidence, by reading it or showing it or handling [sic] it to the jury, is well established." 3 Wigmore, *supra*, § 763. *See also* Underhill *supra*, § 499; 82 A.L.R.2d 473; *Hubbard v. State*, 2 Md. App. 364, 234 A. 2d 775 (1967); *Bulluck v. State*, 219 Md. 67, 148 A. 2d 433 (1959). By contrast, when the recollection of a witness is not refreshed by reference to a memorandum but he recalls the memorandum and recalls that it was accurate when made, he may testify from the memorandum or it may be received in evidence in connection with his direct examination, Underhill, *supra*, § 500; *Askins v. State*, 13 Md. App. 702, 284 A. 2d 626 (1971), the reason being one of necessity. 82 A.L.R.2d 522. But the testimony here establishes that Tuck and Craig possessed a recollection of the shooting that was not dependent on their prior statements and thus did not require proof of the latter. Their affidavits, therefore, were inadmissible in evidence and it was error for the court to receive them.

Nor, contrary to a suggestion by the State in brief, can we find that this error was harmless and not prejudicial to appellant. It is true that a third eyewitness, Winslow Holman, whose affidavit to the police was not made use of by the State on examination nor offered in evidence,

testified to the essential facts of the shooting; [4] and as a rule the testimony of a single eyewitness, if believed, is legally sufficient to convict. *Rodgers v. State,* 4 Md. App. 407, 414, 243 A. 2d 28 (1968). But on balance we are unable to say that it was this testimony, and indeed the combined inculpatory in-court testimony of all three eyewitnesses that constituted the sole foundation of the jury's verdict and not the evidence of the two affidavits which it had before it in the jury room. A measure of the danger which these affidavits, improperly in the jury's hands, posed to its impartial deliberation upon the evidence [5] is the following language from the remainder of Craig's affidavit which, while *merely* cumulative of his in-court testimony insofar as bearing on the issue of alleged prior inconsistency, was *prejudicially* cumulative in its potential effect on the outcome of the jury's deliberations:

"Q. Are you sure the person who shot BUNKY, Arthur Joe Harris, thereby causing his death was Tommy Wilson?

A. Yes there is no doubt that it was Tommy Wilson who shot Bunky and killed him.

\* \* \*

Q. Is there anything you want to add to this statement that you have not previously stated?

A. No, other than I did not think Tommy would shoot Arthur."

What is at stake here, it must be remembered, is the constitutional right of appellant to a fair and impartial jury trial. In these circumstances "an error in admitting plainly relevant evidence which *possibly influenced* the jury adversely to a litigant cannot . . . be conceived of as harmless." *Chapman v. California,* 386 U. S. 18, 23 (1967) (emphasis added); *Fahy v. Connecticut,* 375 U. S. 85 (1963).

---

4. Appellant, he stated, "[S]tarted to walk away. As he walked away he paused for a minute and ducked down, and then turned around . . . and fired."

5. Appellant did, after all, present testimony, of whatever weight, contradictory to the State's evidence that only he and not the decedent was observed with a weapon.

We hold that it was reversible error for the court to receive the affidavits in evidence.

## II

It is appellant's contention that the trial judge also committed reversible error by "telegraphing to the jury his disbelief of a key defense witness." Specifically it is argued that "by the manner and nature of his questioning of Mrs. Wilson" (appellant's mother) and by his facial expressions during her questioning the trial judge made it clear to the jury that he did not believe her.

That the trial court found appellant's mother's testimony incredible is abundantly clear from the transcript. At a bench conference the court stated: "I am thinking of holding her for perjury"; and also that her testimony "hits me right in the pit of my stomach." The court's incredulity was based essentially upon the mother's testimony that she had told no one — neither the police nor her son's attorney nor neighborhood boys threatening reprisals against appellant for the shooting of the decedent — that she had seen the decedent pull out a gun just before he was shot by the appellant and, therefore, that her son had fired in self-defense.

At the bench, it was brought to the trial court's attention by counsel for appellant that the court had, by facial and oral expressions, manifested to the jury his disbelief in the mother's testimony. Defense counsel stated: "Your Honor was shaking his head and smiling as if she was incredible." The court responded that he "wasn't conscious of that" but if it had occurred, "it was natural."

The State contends that the court's conduct did not go beyond acts of intervention by a trial judge in the questioning of a witness to insure the development of essential facts. See *Madison v. State*, 200 Md. 1, 87 A. 2d 593 (1952); *Jefferies v. State*, 5 Md. App. 630, 248 A. 2d 807 (1969).

It is the duty of trial counsel to take appropriate action on the record to preserve for appellate review a claim of

prejudicial error because of alleged absence of judicial restraint. Counsel should not hestitate to make formal objection and move for a mistrial. This was not done in the instant case and the question of whether the trial court committed reversible error in this regard is not before us. Rule 1085.

## III

Winslow Holman, the third eyewitness called by the court, was later recalled as a defense witness. The court sustained an objection to proffered testimony that the victim asked Holman for a gun on the evening of the shooting. It is appellant's position that this testimony would have tended to establish that the decedent had a gun when he was shot; and that the testimony of appellant, appellant's mother and uncle that each had seen a gun in the decedent's hand would have been corroborated.

The proffer made by defense counsel at a bench conference, at which the witness was present and was interrogated by the court, was that Holman was informed by the deceased earlier that evening that he had been robbed and that the deceased then asked the witness for a gun. Mr. Holman had not seen the alleged robbery. He did not give the decedent a gun; nor had he seen him in possession of a gun at any time that day.

Testimony by witness Holman that the deceased told him he had been robbed would have been hearsay and inadmissible; however, testimony by him that the deceased had asked him . . . for a gun was a non-hearsay utterance, a non-assertive implied expression of the deceased's state of mind not resting for its value upon his credibility, and was thus evidentiary on the defense of self-defense. Its weight, in our judgment, should be left to the jury. McCormick, *Law of Evidence* (2d ed. 1972), § 246, p. 584; § 249, p. 590; *cf. Wilkins v. State*, 11 Md. App. 113, 131, 273 A. 2d 236, 245 (1971). The exclusion of the admissible testimony was error.

## IV

On January 12, 1973, the day after the verdict, appellant filed a motion for a new trial.

The subject of a lie detector test had not been mentioned at trial nor was there any proffer of evidence from such a test. *See Sylvester v. State,* 16 Md. App. 638, 647, 299 A. 2d 124 (1973). The motion for a new trial was also silent on the subject.

A hearing on the motion was not held until March 9, 1973 at which appellant was represented by both his trial counsel and by counsel on this appeal. In the interim, appellant's new counsel had persuaded both appellant and his mother to submit to polygraph examinations. The examiner, Harry Mahoney, Esq., was prepared to testify that appellant and Mrs. Wilson told the truth at the trial as to how the shooting occurred, including their testimony that decedent had a gun.

It is contended that the trial court erred in refusing to receive this testimony at the new trial hearing and in refusing to permit the expert's testimony concerning the reliability of the polygraph.

In *Ragler v. State,* 18 Md. App. 671, 308 A. 2d 401 (1973), appellant advanced as a reason for a new trial that he now wished to submit to a lie detector test. We held that the trial court "quite properly ruled that this afforded no basis to award a new trial." That the appellant in this case, and appellant's mother, had actually taken the tests after the trial provides no basis for a departure from *Ragler* nor, indeed, for a reconsideration of the principle adopted by this Court in *Rawlings v. State,* 7 Md. App. 611, 256 A. 2d 704 (1969) that evidence of polygraph tests is inadmissible.

We find no abuse of discretion in the trial court's denial of the motion for a new trial.

> *Judgment reversed; case remanded for a new trial.*