## Richmond

CLYDE EARL SERVIS

v.

## COMMONWEALTH OF VIRGINIA

No. 0984-86-2

Decided July 5, 1988

510

COUNSEL

Elizabeth H. Dashiell (Morchower, Luxton & Whaley, on brief), for appellant.

Leah A. Darron, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**COLE, J.** — Appellant, Clyde Earl Servis, III, appeals his convictions of possession of drug paraphernalia with intent to distribute in violation of Code § 18.2-265.3, possession of marijuana with the intent to distribute in violation of Code § 18.2-248.1, and possession of a controlled substance (cocaine) with intent to distribute in violation of Code § 18.2-248. He assigns the following errors on this appeal: (1) that the trial court erred in not suppressing evidence which was obtained through a warrantless entry into his motel room allegedly in violation of his fourth amendment rights; (2) that the trial court erred in not suppressing evidence obtained pursuant to an inventory search of his car because the circumstances did not warrant its impoundment; and (3) that the trial court erred in not granting his motion to strike the evidence because it was insufficient to establish his intent to distribute marijuana or cocaine. For the following reasons, we find no error and

affirm the convictions.

## I.

At about 4:00 a.m. on January 7, 1986, Valerie Lankford, the front desk clerk at Kings Quarters Motel in Hanover County, received a telephone call from an occupant of room 315 advising her of an attempted break-in to that room. She immediately telephoned the Hanover Police Department. Officers Farmer and Talley arrived on the scene minutes later. Lankford relayed the information she had given the dispatcher that an occupant of room 315 called the front desk to report an attempted break-in to that room.

Officers Farmer and Talley observed the room for about four or five minutes. Observing nothing unusual, they proceeded to the room. They knocked on the door for some time before the defendant finally answered. He only opened the door four or five inches and appeared "nervous," "highly upset," and "under the influence of something." Officer Talley observed that chairs were piled up against the door.

Officer Farmer asked the defendant if "everything was O.K." The defendant said that he had called the front desk because he thought someone had been trying to break in. When asked to whom the room was registered, he said that the room was rented to "Phillip" who had "gone down the block" and "wouldn't be back for a while." When Officer Farmer asked if he could come into the room, the defendant became very upset and refused.

Officers Farmer and Talley returned to the front desk. Lankford showed them the registration form which indicated that rooms 315 and 317 were single, adjoining rooms that had been rented to two people under the name of Eric Steinherner for one night. It also indicated that a Honda with Maryland tags was registered to those rooms. Lankford told the officers that those rooms had received several visitors and calls since she came on duty at 11:00 p.m. and that she "felt like something wasn't right in the room." Officer Farmer then telephoned the Hanover Commonwealth attorney who informed him that there was "no way" he could get a search warrant for the rooms.

Officers Farmer and Talley maintained surveillance of rooms 315 and 317 but noticed nothing peculiar until a cab arrived at

the rooms. Officer Farmer then returned to the motel room while Officer Talley remained in the car. Farmer asked the defendant if the car registered to the room belonged to him; he said that it did. Farmer again asked the defendant to whom the rooms were registered. This time, he said to "Dan" who "had gone down the block." At this point, Officer Farmer asked the defendant to provide some identification because he "didn't feel like [the defendant] should have been in the room at all." The defendant turned around and quickly walked back through the doorway into the adjoining room where Officer Farmer would not have been able to see him. Farmer followed him into the room out of "fear for [his] life." Farmer testified:

> He disappeared in the room quickly and from the manner in which he had been acting and the information that he'd given to me, . . . I asked him for his identification and he turned around and went back into the room and I felt at that point because of my safety and other officers [sic] involved, I should stay right with him. I didn't know what he was going to retrieve.

When Farmer entered the room he stayed right behind the defendant. In the back right-hand corner of the room, he observed a large box of baking soda turned over onto the floor and a grocery bag containing a large dispenser of Reynolds Wrap aluminum foil. Farmer seized those items and arrested the defendant for possession of drug paraphernalia, testifying that, in his experience as a police officer, they were used for freebasing, cutting and packaging cocaine. The defendant was also arrested for giving false information to a police officer.

The defendant still had provided no identification, so he asked to go to his car to retrieve it. Farmer escorted the defendant to his car. The defendant unlocked the car and searched for some identification. He located the car registration but no identification. Farmer called another deputy to transport the defendant to the magistrate's office.

Officer Farmer then contacted the motel clerk and advised her that the man who owned the car registered to rooms 315 and 317 had been arrested. He asked if the motel would take responsibility for the car. When she said that it would not, Farmer called for a

wrecker to tow it. Pursuant to standard police procedure, Officer Farmer then conducted a cursory inventory search of the car in the motel parking lot. Inside a magazine, he found a hypodermic needle and a bottle cap containing what appeared to be drug residue. He ceased his search at that point due to the lateness of the hour and his surmise that the car contained much contraband.

Officer Farmer then proceeded to the magistrate's office where the defendant was being held. After being given his *Miranda* warnings, the defendant stated that there was ten thousand dollars and an ounce of cocaine in the car. He said that the drugs were for his personal use and that the money was not related to the drugs but was for his move to Alabama.

The inventory search pursuant to the impoundment of the defendant's car was conducted according to standard police procedure. It revealed 26.42 grams of cocaine and 2.02 ounces of marijuana, both packaged in bulk; several large plastic bags; five tablets;[1] and a piece of glass, a plastic bag, and a bottle cap, each containing drug residue. No money was located. The defendant was arrested for possession of marijuana and a controlled substance with intent to distribute.

A subsequent search of the two motel rooms turned up only bottle caps containing drug residue. A few days after the arrest, a maid at the Kings Quarters Motel found $9,920 in what had been one of the defendant's rooms. The money, mostly fifty and one hundred dollar bills, was packaged with bank bands in thousand dollar increments.

The defendant testified at trial that he was en route from Silver Spring, Maryland to Mobile, Alabama to visit a friend at Southern Alabama University and to relocate there. He testified that he purchased the drugs in Maryland solely for his personal use and that he had a large supply to last him until he relocated and found a new drug source. He said that he had a bad drug habit and that it would only take him one week to smoke an ounce of marijuana and about ten days to use an ounce of cocaine. He said that he had been injecting and freebasing cocaine the day of his arrest. He testified that he had not been selling and had no

---

[1] The record is unclear whether these were writing tablets or some form of oral medication.

intent to sell drugs. He explained that the $9,920 located in his hotel room was his personal savings that he had brought with him for his move. When asked how he had earned the money, he said he earned it from selling shrimp in Maryland.

The defendant moved to suppress the evidence seized from the motel room and all evidence derived therefrom, contending that his fourth amendment rights were violated when Farmer entered his motel room without a warrant. He also moved to suppress the evidence seized from the inventory search of his car, contending that impoundment of his car was not warranted under the circumstances. The trial court overruled both motions. At the close of the evidence, the defendant moved to strike the evidence for failure of the evidence to show intent to distribute. The trial court overruled the motion. The defendant was subsequently convicted of possession of drug paraphernalia with intent to distribute, possession of marijuana with intent to distribute and possession of a controlled substance with intent to distribute. This appeal followed.

## II.

The defendant contends that the trial court erred in refusing his motion to suppress the evidence seized in the motel room and all evidence derived therefrom because no exigent circumstances existed to justify a warrantless entry into the motel room. The Commonwealth contends that exigent circumstances did exist and that, in any event, Officer Farmer was justified in following the defendant into his motel room under the authority of a *Terry* "stop and frisk."

The fourth amendment rights of a guest in a motel room are equivalent to those of the rightful occupants of a house. *Stoner v. California*, 376 U.S. 483, 490 (1964). The fourth amendment protects people against *unreasonable* searches and seizures. A warrantless entry into a dwelling is presumptively unreasonable. *Cf. Katz v. United States*, 389 U.S. 347, 357 (1967). "Exigent circumstances, however, may justify as reasonable a warrantless entry into a dwelling [and] a search of the interior." *Verez v. Commonwealth*, 230 Va. 405, 410, 337 S.E.2d 749, 752 (1985), *cert. denied*, 479 U.S. 813 (1986).

Exigent circumstances justifying a warrantless entry and search exist only where the police have probable cause to obtain a

search warrant but, due to the nature of the situation, are precluded from doing so. Factors considered relevant in determining the exigency of the situation include:

(1) the degree of urgency involved and the time required to get a warrant; (2) the officers' reasonable belief that contraband is about to be removed or destroyed; (3) the possibility of danger to others, including police officers left to guard the site; (4) information that the possessors of the contraband are aware that the police may be on their trail; (5) whether the offense is serious, or involving violence; (6) whether officers reasonably believe the suspects are armed; (7) whether there is, at the time of entry, a clear showing of probable cause; (8) whether the officers have strong reason to believe the suspects are actually present in the premises; (9) the likelihood of escape if the suspects are not swiftly apprehended; and (10) the suspects' recent entry into the premises after hot pursuit.

*Id.* at 410-11, 337 S.E.2d at 753. "[I]n determining whether exigent circumstances were sufficient to overcome the presumption of unreasonableness and justify a warrantless entry, the court must examine the circumstances as they reasonably appeared to the law enforcement officers on the scene." *Id.* at 411, 337 S.E.2d at 753.

Applying the foregoing principles, we find no support for the Commonwealth's position that exigent circumstances existed. Officer Farmer did not have probable cause to enter or search the motel room, as the Hanover County Commonwealth attorney properly advised him. While Officer Farmer had a reasonable belief that the defendant was the reported burglar who might be armed and dangerous and might be holding the lawful occupants of the motel rooms, such a belief was not supported by enough objective facts to justify a warrantless entry into and a full scale search of the motel room.

Because exigent circumstances did not exist, our decision in this case turns on whether, and to what extent, the police can, during a valid *Terry* stop, make a warrantless entry into a dwelling. Initially, we find that the "stop" of the defendant was clearly valid. "[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable

cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968). "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information" is a reasonable seizure. *Adams v. Williams*, 407 U.S. 143, 146 (1972). By statute in Virginia, a "police officer may detain a person in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or possesses a concealed weapon . . . and may require of such person his name and address." Code § 19.2-83. Indeed, the defendant does not question the legality of the "stop" but instead he questions the scope of the "frisk."

■ In *Terry*, police officers were given "a narrowly drawn authority to . . . search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." *Terry*, 392 U.S. at 27. In determining whether an officer's belief is reasonable, "due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Id.*

■ The defendant does not contest the reasonableness of Officer Farmer's belief; he contests the scope of the "frisk" incident to that belief, contending that where an officer has reason to believe that he is dealing with an "armed and presently dangerous" individual, *Terry* confines a "frisk" to "a carefully limited search of the outer clothing of such person in an attempt to discover weapons which might be used to assault him." *Id.* at 30. However, the defendant is mistaken in this belief. While the "frisk" in *Terry* was limited to a pat-down of the suspect's outer clothing, Supreme Court, lower federal court, and state court cases since *Terry* have extended the scope of a frisk beyond the suspect's outer clothing. *See, e.g., Michigan v. Long*, 463 U.S. 1032 (1983) (*Terry* search for weapons extends to passenger compartment of car); *United States v. McClinnhan*, 660 F.2d 500 (D.C. Cir. 1981) (*Terry* search of briefcase upheld); *United States v. Johnson*, 637 F.2d 532 (8th Cir. 1980) (*Terry* search for weapons extends to area within suspect's immediate control); *United States v. Riggs*, 474 F.2d 699 (2d Cir. 1973) (*Terry* search of camera case upheld); *Henighan v. United States*, 433 A.2d 1059 (D.C. 1981) (*Terry* search of purse upheld); *State v. Ortiz*, 67 Hawaii 181, 683 P.2d 822 (1984) (*Terry* search of knapsack upheld); *Williams v. State*,

19 Md. App. 204, 310 A.2d 593 (1973) (*Terry* search extends to area within which suspect might gain access to weapons); *People v. Brooks*, 65 N.Y.2d 1021, 484 N.E.2d 132, 494 N.Y.S.2d 103 (1985) (*Terry* search for weapons extends to area within suspect's immediate control); *People v. Pugach*, 15 N.Y.2d 65, 204 N.E.2d 176, 255 N.Y.S.2d 833 (1965) (*Terry* search of brief case upheld); *State v. Davis*, 295 Or. 227, 666 P.2d 802 (1983) (*Terry* search for weapons extends to area within suspect's immediate control); *Wood v. State*, 515 S.W.2d 300 (Tex. Crim. App. 1974) (*Terry* search for weapons extends to area within suspect's immediate control).

Of particular importance to this case is *Michigan v. Long*, 463 U.S. 1032 (1983). In *Long*, two police officers stopped the defendant's car to investigate his erratic driving. *Id.* at 1035. The defendant was unresponsive to the officers' request for his driver's license and registration and he "appeared to be under the influence of something." *Id.* at 1036. When the defendant turned from the officers and began walking toward his vehicle, the officers followed him and observed a hunting knife on the floorboard of the car. The defendant was then stopped and frisked; no weapons were discovered, so the officers searched the car for other weapons and discovered marijuana. *Id.*

The defendant contended, and the Michigan Supreme Court agreed, that the officers' entry into and search of his vehicle could not be justified under the principles set forth in *Terry* because " '*Terry* authorized only a limited pat-down search of a *person* suspected of criminal activity' rather than a search of an area." *Id.* at 1045 (quoting *People v. Long*, 413 Mich. 461, 472, 320 N.W.2d 866, 869 (1982)). The Supreme Court disagreed: "Contrary to Long's view, *Terry* need not be read as restricting the preventative search to the person of the detained suspect." *Id.* at 1047. The Court, recognizing that "suspects may injure police officers and others by virtue of their access to weapons, even though they may not themselves be armed," *id.* at 1048, held:

> Our past cases indicate . . . that protection of police and others can justify protective searches when police have a reasonable belief that the suspect poses a danger, that roadside encounters between police and suspects are especially hazardous, and that danger may arise from the possible presence

of weapons in the area surrounding a suspect. These principles compel our conclusion that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant" the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Id.* at 1049 (quoting *Terry*, 392 U.S. at 21) (footnote omitted).

Similarly, we find support for Officer Farmer's entry into the defendant's motel room pursuant to a *Terry* stop in *Washington v. Chrisman*, 455 U.S. 1 (1982). In *Chrisman*, a Washington State University police officer observed Overdahl, a university student, leaving a student dormitory carrying a half-gallon bottle of gin in violation of state law and university regulations. The officer stopped and arrested him and asked for his identification. When Overdahl said that his identification was in his dormitory room, the officer accompanied him to retrieve it. *Id.* at 3. Upon entering the dormitory room, the officer observed, in plain view, marijuana seeds and a small pipe. Overdahl and his roommate, Chrisman, admitted possession of drugs, and a subsequent search of the dormitory room revealed quantities of marijuana and LSD. Chrisman was tried and convicted on two counts of drug possession. *Id.* at 4.

On appeal, Chrisman contended that the officer was not entitled to accompany Overdahl from the public corridor of the dormitory into his room, absent a showing that such "intervention" was required by "exigent circumstances." *Id.* at 6. The United States Supreme Court disagreed:

[I]t is not "unreasonable" under the Fourth Amendment for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest. The officer's need to ensure his own safety—as well as the integrity of the arrest—is compelling. Such surveillance is not an impermissible invasion of the privacy or personal liberty of an individual who has been arrested.

*Id.* at 7. The Supreme Court thus adopted a *per se* rule that once a suspect is placed under arrest, an officer is authorized in accom-

panying the arrestee wherever he goes.

■ While we do not go so far as to adopt such a *per se* rule in a *Terry* context, we find that the concerns present in an arrest situation may also be present in an investigatory detention. As the Supreme Court noted in *Long*, 463 U.S. at 1050, "[i]f a suspect is 'dangerous,' he is no less dangerous simply because he is not arrested." "[A] *Terry* investigation . . . involves a police investigation 'at close range,' when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger.' " *Id.* at 1053 (citations omitted) (emphasis in original). Once an officer has lawfully stopped a suspect, he is "authorized to take such steps as [are] reasonably necessary to protect [his and others'] personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985).

■ Applying the principles announced in *Long*, *Chrisman*, and *Hensley*, we hold that police officers may, whenever they possess an articulable and objectively reasonable belief that a suspect is presently or potentially dangerous, conduct a protective search of the area within the suspect's immediate control. If the suspect moves about, an officer is justified in staying with the individual during the course of the stop and conducting a protective search of the areas which come within the suspect's immediate control, even if this action necessitates entry into the suspect's home. *Accord State v. Mayfield*, 10 Kan. App. 2d 175, 694 P.2d 915 (1985) (where officers reasonably believed that suspect was potentially dangerous, they were justified in accompanying him into his apartment when he entered it purportedly to retrieve identification); *Commonwealth v. Daniels*, 280 Pa. Super. 278, 421 A.2d 721 (1980) (suspicious conduct of suspect upon being questioned at door justified officers in following him into his home). *Contra State v. Davis*, 295 Or. 227, 666 P.2d 802 (1983) (even where officers reasonably believed that suspect was potentially dangerous, they were not justified under *Terry* in following him into his motel room).

We are not unmindful that such a holding will allow warrantless entries into dwellings in certain extenuating circumstances. However, we find that this holding is necessary in the interest of police protection. As one judge stated in a case similar to the one

at bar:

> I, too, am troubled by the entry into the home. But once the crucial factor exists — a need to search for the protection of the police — I would not forbid police to do what they did here, for the risk to the police is the same, on whichever side of the threshold [the] defendant is standing.

*State v. Davis*, 295 Or. 277, ___, 666 P.2d 802, 819 (1983) (Peterson, J., dissenting).

In the present case, Officer Farmer had an articulable and objectively reasonable basis for suspecting that the defendant was potentially dangerous. As in *Long*, the hour was late and the area was rural. The police had been called to the scene to investigate a possible break-in to the room in which the defendant was found. The defendant appeared "nervous," "highly upset," and "under the influence" of some intoxicant. Twice he gave false answers to the police about to whom the rooms were registered. Chairs were piled against the door to block entry. When asked for his identification, the defendant "quickly" retreated into the room without responding. Based on the totality of the circumstances, Officer Farmer could reasonably suspect that the defendant was the reported burglar who might be armed and potentially dangerous. Accordingly, he was justified in conducting a pat-down of the defendant's outer clothing and a protective search of the area within the defendant's immediate control, as well as monitoring the defendant's movements during the course of the stop. Therefore, we find that Officer Farmer's warrantless entry into the motel room was reasonable. Since Officer Farmer was then lawfully in a position to view the seizable items, the drug paraphernalia, the plain view exception to the warrant requirement consequently applied and the evidence seized was admissible. *See Coolidge v. New Hampshire*, 403 U.S. 443 (1971).

### III.

▮ Having ruled that the initial warrantless entry into the defendant's motel room was justified under *Terry*, we must now determine whether the impoundment of the defendant's vehicle and the inventory search pursuant thereto were reasonable under the fourth amendment. In *South Dakota v. Opperman*, 428 U.S. 364

(1976), the Supreme Court held that a routine inventory search of a *lawfully impounded* vehicle conducted pursuant to standard police procedure is reasonable under the fourth amendment unless it is "a pretext concealing an investigatory motive." *Id.* at 376. Since Officer Talley testified that the inventory search was conducted pursuant to Hanover County Sheriff's Department regulations, and there is no evidence in the record that the police had an investigatory motive, the crux of the issue in this case is whether the defendant's car was lawfully impounded.

The Supreme Court has upheld impoundment of vehicles pursuant to police "community caretaking functions:"

In the interests of public safety and as part of what the Court has called "community caretaking functions," . . . automobiles are frequently taken into police custody. Vehicle accidents present one such occasion. To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities. Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic. *The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.*

*Id.* at 368-69 (citation omitted) (emphasis added).

The Supreme Court also has implicitly upheld the impoundment of vehicles pursuant to a state forfeiture statute, *see Cooper v. California*, 386 U.S. 58 (1967), and the impoundment of vehicles that are evidence of a crime. *See Harris v. United States*, 390 U.S. 234 (1968) (per curiam). The Supreme Court has not addressed the lawfulness of an impoundment where the vehicle is not "impeding traffic or threatening public safety" but is impounded solely to protect a defendant's property when he is arrested away from home. However, the Virginia Supreme Court has addressed the issue.

In *Cabbler v. Commonwealth*, 212 Va. 520, 184 S.E.2d 781 (1971), *cert. denied*, 405 U.S. 1073 (1972), a Roanoke police officer had an arrest warrant for Cabbler. The officer arrested Cabbler at the Roanoke Memorial Hospital after observing him park his car in the hospital's ambulance driveway such that it blocked the emergency entrance. *Id.* at 521, 184 S.E.2d at 782. Upon arresting Cabbler inside the hospital, the officer impounded his car pursuant to "long-standing practice and policy" of the Roanoke Police Department to take temporary custody of an arrestee's property for safekeeping when he is arrested away from home and no other immediate means are available to protect such property. *Id.* at 522, 184 S.E.2d at 782. Once impounded, the contents of the car were removed and inventoried and stolen goods were discovered. *Id.* at 521, 184 S.E.2d at 782.

Cabbler contended that the search and seizure were unlawful. The court disagreed:

It has always been the public policy of the Commonwealth to preserve and protect the individual rights of its citizens. Public policy also dictates that a citizen's rights in his property shall likewise be preserved and protected. Thus it would appear, and we so hold, that the policy established and the procedure followed by the Roanoke Police Department to protect the property of a citizen arrested away from his home in possession of property where no other immediate means is available for safekeeping of such property are reasonable and in accord with the public policy of the Commonwealth . . . .

*Id.* at 522, 184 S.E.2d at 782. The court concluded that the seizure and subsequent search were not unreasonable because the procedure was "in accord with the public policy of the Commonwealth, [was] not violative of the defendant's Fourth Amendment rights and serve[d] the best interest of the property owner by protecting and safeguarding the property in his possession at the time of his arrest."[2] *Id.* at 523, 184 S.E.2d at 783.

---

[2] Although *Cabbler* could have been decided based on the clear authority of the police to seize and remove vehicles "impeding traffic or threatening public safety" since Cabbler's car was parked illegally, blocking the hospital's emergency entrance, it was not decided on those grounds. *See Cabbler v. Superintendent*, 528 F.2d 1142 (4th Cir. 1975) (habeas corpus).

In this case, Officer Farmer stated that he acted "pursuant to written SOP [standard operating procedure] policy of the [Hanover County] Sheriff's Department" in towing the defendant's car. He did not state what that procedure was and the written procedure was not introduced in evidence. However, it can be inferred from the record that the procedure followed in this case was sufficiently analogous to that in *Cabbler* to pass constitutional muster. Officer Farmer testified that he had the car towed pursuant to standard police procedure. He further stated that had the Kings Quarters Motel taken responsibility for the car, he would not have taken custody of it, nor would he have taken custody of it if someone else had been immediately available to assume responsibility for it. Further, the defendant did not object to the impoundment or suggest any other disposition.

Officer Farmer's decision to impound the defendant's car was reasonable under the totality of the circumstances. Although the car was registered to the rooms under someone else's name, the defendant had the key and claimed ownership, and the officers had observed him exercising dominion and control over it. Although the car was lawfully parked on the motel premises until eleven o'clock that morning, it was uncertain whether the defendant would be processed and released before that time. Further, the motel clerk asked that it be removed. Under these circumstances, we find that the impoundment of the defendant's car was reasonable. Consequently, the car was lawfully impounded and the inventory search pursuant to standard police procedure was valid.

## IV.

Finally, although the defendant admits possession of marijuana and cocaine, he maintains that the evidence was insufficient to establish an intent to distribute either cocaine or marijuana. In passing on the sufficiency of the evidence, we are guided by well-established principles:

> On appeal, we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. The judgment of a trial court sitting without a jury is entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong

or without evidence to support it.

*Martin v. Commonwealth*, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987).

■ Where an offense consists of an act combined with a particular intent, proof of the intent is essential to the conviction. *Patterson v. Commonwealth*, 215 Va. 698, 699, 213 S.E.2d 752, 753 (1975). Because direct proof of intent is often impossible, it must be shown by circumstantial evidence. But "[w]here . . . the Commonwealth's evidence of intent to distribute is wholly circumstantial, 'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.' " *Wells v. Commonwealth*, 2 Va. App. 549, 551, 347 S.E.2d 139, 140 (1986) (quoting *Inge v. Commonwealth*, 217 Va. 360, 366, 228 S.E.2d 563, 567 (1976)).

■ "The quantity of a controlled substance is a factor which may indicate the purpose for which it is possessed. Possession of a small quantity creates an inference that the drug is for personal use." *Monroe v. Commonwealth*, 4 Va. App. 154, 156, 355 S.E.2d 336, 337 (1987). Possession of a small quantity of a controlled substance, however, when considered with other circumstances, may be sufficient to establish an intent to distribute. *Dutton v. Commonwealth*, 220 Va. 762, 765, 263 S.E.2d 52, 54 (1980).

■ The method of packaging of the controlled substance is such a circumstance. *Monroe*, 4 Va. App. at 156, 355 S.E.2d at 337. "However, even if the substance is packaged for distribution, there must be additional evidence to preclude the inference that it was purchased in the packaged form for personal use rather than being held in that fashion for distribution." *Id.* "The additional evidence available to preclude such an inference [may be] the presence of a large, or bulk, quantity from which smaller packages may have been made up for distribution," *id.* at 156-57, 355 S.E.2d at 337, or "the presence of paraphernalia used in the packaging process." *Hambury v. Commonwealth*, 3 Va. App. 435, 438, 350 S.E.2d 524, 525 (1986).

■ The presence of an unusual amount of money, suggesting profit from sales, is another circumstance that negates an inference of possession for personal use. *See Colbert v. Commonwealth*, 219 Va. 1, 4, 244 S.E.2d 748, 749 (1978); *see also Dukes*

*v. Commonwealth*, 227 Va. 119, 123, 313 S.E.2d 382, 384 (1984); *Wells*, 2 Va. App. at 551-52, 347 S.E.2d at 140.

Guided by these principles, we find that the evidence was sufficient to support convictions of possession of marijuana and cocaine with the intent to distribute. While the quantity possessed was relatively small, the cocaine was packaged in bulk and the marijuana was packaged in distributable form. Paraphernalia used in the packaging process was seized from the motel room. Finally, the defendant was in possession of almost ten thousand dollars in cash — an unusual amount of money which suggests profit from consummation of sales.

While the defendant gave an explanation for the money at trial, it was within the judge's province to assess the defendant's credibility and the weight to be given his testimony. *See Barker v. Commonwealth*, 230 Va. 370, 373, 337 S.E.2d 729, 732 (1985). Although his testimony was uncontradicted and therefore ordinarily should have been accepted as true, "[i]t may be disbelieved where it is inherently improbable, inconsistent with circumstances in evidence, or somewhat contradictory in itself, especially where the witness is a party." *Stegall v. Commonwealth*, 208 Va. 719, 722, 160 S.E.2d 566, 568 (1968).

The defendant stated that he had the ten thousand dollars with him for his relocation to Alabama and that the money was from his personal savings. However, he had no bank account from which he withdrew the money and no satisfactory explanation for how he earned the money. On these facts, the judge could reasonably conclude that the money was earned from the sale of drugs.

For the foregoing reasons, we affirm the judgments of the trial court.

*Affirmed.*

Duff, J., concurred.

Benton, J., dissenting.

I would reverse the conviction and dismiss the indictments because the Commonwealth (1) failed to establish a justification for the warrantless entry into Clyde Servis' motel room, (2) did not establish a valid basis for impounding and searching Servis' auto-

mobile, and (3) did not prove beyond a reasonable doubt that Servis possessed the controlled substances with intent to distribute.

## I.

A warrantless entry into a residence, like a warrantless search, is presumptively unreasonable and, thus, violative of the fourth amendment. *Welsh v. Wisconsin*, 466 U.S. 740, 748-49 (1984); *Vale v. Louisiana*, 399 U.S. 30, 34 (1970). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980); *see Walls v. Commonwealth*, 2 Va. App. 639, 644, 347 S.E.2d 175, 178 (1986). The fourth amendment protections against a warrantless entry and search of a residence apply with equal force to an individual's motel room. *See Stoner v. California*, 376 U.S. 483, 490 (1964); *Verez v. Commonwealth*, 230 Va. 405, 410, 337 S.E.2d 749, 752 (1985), *cert. denied*, 107 S. Ct. 63 (1986).

Although I concur with the majority opinion's view that the police should not be exposed to unnecessary danger in the performance of their jobs, I strongly disagree that the officers had a legal basis for entering Servis' motel room. In my opinion the Commonwealth did not meet its burden of establishing an exception to the warrant requirement. *See Walls*, 2 Va. App. at 645, 347 S.E.2d at 178. Even though the majority rejects the Commonwealth's assertion that exigent circumstances existed, it concludes that the police may "make a warrantless entry into a dwelling" to effect a *Terry* stop. I find no support for this holding, nor can I subscribe to reasoning adopted by the majority to sustain warrantless invasions of dwellings by police. "The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards." *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973).

The evidence relating to the entry into the room established that at approximately 4 a.m. Deputies Farmer and Talley arrived at the manager's office of a Hanover County motel in response to her telephone call and were told that the occupant of room 315

had reported that someone was trying to break into the room. The manager testified that at the time she called she did not give the deputies the names of the room's occupants or any other information. Deputy Farmer testified, however, that the manager informed him at that time that the two adjoining rooms were registered to Eric Steinherner and gave him the license number of the vehicle that was registered to the room.

The deputies observed room 315 from their automobile for four to five minutes without noticing unusual activity and then knocked on the door. Servis answered the door and informed the deputies that he placed the call because he thought someone was attempting to break into his room. Deputy Farmer testified that Servis was nervous and appeared to be "under the influence of something." Although Deputy Talley could not see into the adjoining room, he was able to see into the room where Servis stood and he observed chairs stacked against the door. Deputy Farmer could not see into the room.

Deputy Farmer asked Servis if he could come into the room. Servis said "no." He told the deputies that he did not need them and that he had only wanted the motel's security personnel. Servis gave his name to the deputies and identified his automobile, parked approximately six parking spaces away from the door, by pointing to it. He also informed the deputies that the room was registered to his friend, who was out but was expected back. Deputy Farmer testified that he identified his friend by the name "Phillip;" however, Deputy Talley recalled that he identified his friend by the name "Dan."

The deputies then left Servis and returned to their vehicle. Both testified that they did not suspect Servis of anything at that point. After sitting outside the room for a while, Deputy Farmer returned to the manager's desk. Deputy Talley and the manager testified that it was during this second visit to the manager's office that Deputy Farmer received a description of the vehicle that was registered to the room. It was the same vehicle that Servis had previously identified. The manager also testified that on Deputy Farmer's second visit to her office she gave him the registration form that showed the room registered for two persons in Steinherner's name. She also informed him that earlier several visitors had gone to the room. While Deputy Farmer was at the manager's office, a taxi driver arrived, stating that he had received

a call to pick up a passenger from rooms 315 and 317.

Deputy Farmer testified that he called the Commonwealth's Attorney from the manager's office, seeking a search warrant. He was told that "there was no way [he] could get a search warrant." Although the record does not contain the reasons he believed a warrant was justified, Deputy Farmer did testify that he had no reason to go into the room "at that point."

Deputy Farmer testified that he returned to Servis' room "before [Servis] came out to the cab." Deputy Farmer said he knocked on the door and asked again who the room was registered to. He testified that when Servis said "Dan," he asked Servis for some type of identification. His testimony at various times was as follows:

A  I asked him, I said I need to see some identification. At that time, he turned around and walked directly back into the room.
Q  Okay. Was this before or after he had gone to the car? Do you remember?
A  This is before he went to the car.

\* \* \*

Q  All right. When you asked for his identification, where did he go?
A  He went directly from the open doorway through into the room on the left.
Q  Okay.
A  I was right behind him the whole way.

On cross examination by the Commonwealth he stated:

Q  Now when you go back to the room, you ask him again who the room's registered to?
A  Yes, sir.
Q  And does he give you the name of the person the room is registered to?
A  He gave me the name of Dan which —
Q  What you get is not a name that's on the registration?
A  Correct.

Q  And now he's given you two different names. What did
    you do at that point?
A  At that point, I asked him, I said I need to see some
    identification from you right now, and he turned around
    and went back into the room and that's when I followed
    right behind him.

Deputy Talley testified that when Deputy Farmer went to the
manager's office and returned to the motel room he (Talley) re-
mained in his automobile where he could observe the room. A few
minutes after Deputy Farmer entered the room, Deputy Talley
said that he went into the room and observed Servis sitting on the
bed while Deputy Farmer was speaking on the telephone.

The majority concludes, and I agree, that these facts do not
remotely establish exigent circumstances that justify a warrantless
entry. However, the majority holds that "in the interest of police
protection" a police officer may enter a dwelling to conduct a pro-
tective search when he is suspicious of the conduct of the occu-
pant. I find no support in the case law for the majority's thesis.

The majority relies upon *Washington v. Chrisman*, 455 U.S. 1
(1982) to support its theory that entry into a dwelling may be
made to effect a *"Terry* stop." A statement of the holding of
*Chrisman*, however, is sufficient without further elaboration to il-
luminate precisely why it is inapposite to this case:

> [I]t is not "unreasonable" under the Fourth Amendment for
> a police officer as a matter of routine, to monitor the move-
> ments of an *arrested person*, as his judgment dictates, *fol-
> lowing the arrest. . . .* Such surveillance is not an impermis-
> sible invasion of the privacy or personal liberty of an
> individual who has been *arrested*.

*Id.* at 7 (emphasis added). The majority also relies upon *State v.
Mayfield*, 15 Kan. App.2d 175, 694 P.2d 915 (1985), which easily
can be distinguished factually from this case. In *Mayfield*, unlike
the present case, the officers had a reasonable suspicion that the
defendant, who was stopped outside his residence, had violated a
state statute. Moreover, the *Mayfield* court cites only *Chrisman*
as its authority for upholding a "stop and frisk" detention which
had not ripened into an arrest, yet it fails to provide a principled

basis for such an extension of the *Chrisman* holding. In *Commonwealth v. Daniels*, 280 Pa. Super. 278, 421 A.2d 721 (1980), also cited by the majority, the court ruled that the police officers "had the consent of Daniels to enter the premises." *Id.* at _____, 421 A.2d 723. No such argument has been or could be advanced upon the facts of this case.

Using principles applicable to automobile stop cases, the majority opinion glosses over the distinctive and fundamental protections afforded to dwellings under fourth amendment analysis and asserts that *Michigan v. Long*, 463 U.S. 1032 (1983), an automobile case, is "[o]f particular importance to this case." While the Supreme Court has used the "automobile exception" doctrine to relax fourth amendment warrant requirements because of special circumstances inherent in automobile stops, *see Chambers v. Maroney*, 399 U.S. 42 (1970); *Carroll v. United States*, 267 U.S. 132 (1925), the Court has consistently given dwellings the highest degree of fourth amendment protection against warrantless entry by law enforcement officers. *See Payton*, 445 U.S. at 585-86; *United States v. United States District Court*, 407 U.S. 297, 313 (1972). In *Long*, on which the majority bases, in part, its justification for applying a "Terry stop" analysis to searches of private dwellings, the Supreme Court discussed in detail the circumstances that give rise to the "inordinate" risk that confronts officers who, late at night, approach automobiles whose drivers have been stopped for committing traffic violations. *Id.* at 1047-51. Long had driven his automobile into a ditch after speeding and driving erratically. He was frisked and his vehicle searched after police saw a large knife in his vehicle. *Id.* at 1035-36. The Supreme Court grounded its decision "in part on [a] view of the danger presented to police officers in 'traffic stop' and automobile situations." *Id.* at 1048; *see also Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977).

The majority notes that, as in *Long*, the hour was late and the location not well traveled. Such circumstances, however, were given in *Long* as relevant considerations when analyzing the "inordinate" risk of stopping automobiles. No justification exists for applying those concerns to the circumstances of this case where there has been a warrantless entry into a place that is functionally equivalent to a dwelling and, as such, is entitled the greatest protection under the fourth amendment. The relevance of those considerations as applied to the entry of a motel room are *de minimis*

and unexplained by the majority. The majority opinion's thesis that in the absence of exigent circumstances "the interest of police protection" justifies a warrantless entry into a dwelling upon a mere showing of "extenuating circumstances" simply lacks a sound foundation.

In *State v. Davis*, 295 Or. 227, 666 P.2d 802 (1983), a case with circumstances similar to this one, the Oregon Supreme Court rejected the precise argument that the Commonwealth relies upon and majority asserts here.

> The state attempts to bootstrap the police officers' entry into Defendant's room by merging two independent doctrines i.e., the stop and frisk doctrine with the emergency doctrine, in order to fill the gaps of one doctrine with the arguably permissible scope of another. Thus, their "emergency" or exigent circumstance, is, in their words, the need to "neutralize" the area for their own protection while carrying on the questioning. We decline the invitation to stretch either of these doctrines in order to justify the police officers' actions based on the facts presented here. Such a modification or blending of the two doctrines would create an exception to the warrant requirement which would effectively swallow the rule.

> The very purpose of our constitutional provision was to protect a person's home from governmental intrusions. This right against intrusion should be stringently protected by the courts. As such, any exceptions to the warrant requirement should be narrowly and carefully drawn. The state's proposed rule that police officers, having authority to encounter a defendant and make reasonable inquiry, are thereby entitled to enter a defendant's premises in order to serve the needs of their safety, would be contrary to this principle of carefully drawn exceptions. We are mindful of the dangers inherent in the work of police officers. The potential for violence exists in all confrontations between police and private citizens. But a remote possibility to harm to the police officers cannot justify a warrantless entry into the private recesses of one's house.

*Id.* at 242-43, 666 P.2d at 812 (citations omitted). The justification for the authorization of a warrantless entry, which the major-

ity opinion crafts upon the circumstances of this case, is equally unwarranted.

Furthermore, in my opinion the record does not otherwise provide a basis upon which the trial court or this Court could conclude that Deputy Farmer had a legitimate basis for entering the room without a warrant. Beyond Deputy Farmer's naked statement that he entered the room because of "[f]ear of my life," there is no factual basis for his entry into the room. The record does not support a conclusion that Deputy Farmer could reasonably have believed that his life was in danger, nor does it support a conclusion that he had a reasonable articulable suspicion that Servis had committed or was about to commit a crime. Although Deputy Farmer testified that Servis was nervous and apparently under the influence of something when the deputies first knocked on the door and became upset when the deputies asked to enter the room, both deputies testified that they did not suspect Servis of anything at that time. Their lack of concern at that time is buttressed by the fact that Servis was not then or later frisked for weapons.

According to Deputy Farmer's testimony, it was not until he learned from the manager that several persons had visited the room that night and learned that a taxicab had been called to the room that he became "suspicious." He then called the Commonwealth's Attorney who told him that based on his observations a search warrant was out of the question. The record is silent as to what Deputy Farmer suspected. Whatever it was that he suspected, Deputy Farmer pointed to no facts from which he could reasonably have concluded, based on his suspicions or other circumstances, that Servis was dangerous.

Having been told that a search warrant would not be issued, Deputy Farmer returned to the room ostensibly to require Servis, who had previously given his name and identified his car, to provide some identification. As Servis acted to comply with his request, Deputy Farmer gave the following as his basis for concluding that his life was in danger:

He disappeared in the room quickly and from the manner in which he had been acting and the information that he'd given to me, I felt at that point, I asked him for his identification and he turned around and went back into the room

and I felt at that point because of my safety and other officers involved, I should stay right with him. I didn't know what he was going to retrieve.

Having failed to alert Deputy Talley of his suspicion and having approached the room without the assistance of Deputy Talley, Deputy Farmer's actions belie his stated concern for his own safety and render doubtful his concern for the safety of Deputy Talley, who, according to his testimony, remained seated in the vehicle. It is also significant that Deputy Farmer did not frisk Servis, despite his professed fear, as stated at trial, that he believed Servis was dangerous.

Moreover, Deputy Farmer did not articulate grounds for an objectively reasonable suspicion that Servis had committed or was about to commit a crime at the time Farmer demanded that he produce documentary identification. Although no statute requires one who is not driving a motor vehicle to carry an identification card or to produce an identification card upon the demand of a police officer, Deputy Farmer demanded that Servis produce documents and used Servis' attempt to promptly comply with his demand as a pretext to enter his room. Having earlier made a request for a search warrant, the evidence clearly supports the inference that, before he demanded documentary identification, Farmer wanted to enter the room. The evidence also supports the inference that the ruse of requesting documentary identification provided the pretext that Farmer needed to cross the threshold.

The facts relied upon by the majority also do not support the conclusion that Deputy Farmer reasonably believed he was in danger. That Servis may have appeared "under the influence of some intoxicants" while in his motel room does not translate into a belief that he must have been armed or dangerous. Likewise, that Servis appeared upset when denying a law enforcement officer free reign of his room does not support the notion that he was armed or dangerous. It is of no moment that he responded quickly to the officer's demand for identification. Had he not quickly responded, the majority, which relies upon *Long* to justify this entry, would have considered his lack of promptness as a reason for also concluding that he was a threat to the officers. *See Long*, 463 U.S. at 1036 (driver slow to responding to officer's request for driver's license and car registration).

The facts and circumstances that the deputies encountered, while peculiar, provided no reasonable basis for either of them to believe that Servis was armed or dangerous. In every police-citizen encounter one can detail a laundry list of facts which can be cited as "unusual;" however, in order to justify a stop the evidence must establish the existence of a "reasonable suspicion, based on objective facts, that the individual is involved in criminal activity." *Zimmerman v. Commonwealth*, 234 Va. 609, 611, 363 S.E.2d 708, 709 (1988). Moreover, under traditional fourth amendment analysis, in order to justify a "frisk," there must be shown a nexus between those "unusual" circumstances and the officer's purely subjective assumption of danger. In my opinion, the facts established in this case do not rise to that level. Furthermore, there is no basis upon which to conclude that Servis posed a danger justifying the extraordinary kind of "frisk" or entry to a dwelling that is sought to be upheld.

## II.

Even if it is assumed that Farmer had a reasonable, articulable suspicion that Servis was dangerous and that the entry into his room was justified, there is no basis for upholding the impoundment and subsequent search of his automobile. The Commonwealth does not contend that there was probable cause to search the automobile; instead, the Commonwealth seeks to justify the search of Servis' automobile on the ground that it was necessary to impound the automobile and inventory its contents in order to safeguard the automobile and its contents.

In *South Dakota v. Opperman*, 428 U.S. 364 (1976), the Supreme Court upheld a protective inventory, also described as a "caretaking search," of an automobile which was "lawfully within police custody." *Id.* at 375-76. The inventory of the contents of a lawfully impounded automobile was recognized as a means of protecting "[1] the owner's property while it remains in police custody, . . . [2] the police against claims or disputes over lost or stolen property, and . . . [3] the police from potential danger." *Id.* at 369 (citations omitted). However, in order "[f]or an inventory search to be valid, the vehicle searched should first be in the valid custody of the law enforcement officers conducting the inventory." *United States v. Brown*, 787 F.2d 929, 931-32 (4th Cir.), *cert. denied*, 479 U.S. 837 (1986); *see South Dakota v.*

*Opperman*, 428 U.S. at 374; *Randall v. State*, 656 S.W.2d 487, 490 (Tex. Crim. App. 1983).

> The government must demonstrate that [the] vehicle was in lawful police custody prior to its search; that the search was routine and conducted pursuant to standard police procedures following the guidelines laid down in *Opperman*; and that the search was conducted solely for the purpose of securing and inventorying the automobile's contents, and not for the purpose of gathering incriminating evidence against the owner.

*United States v. Abbott*, 584 F. Supp. 442, 447 (W.D. Pa. 1984).

Thus, the initial questions to be resolved are whether the deputies had valid custody of Servis' automobile and, if so, whether a need to impound the automobile was demonstrated. It is undisputed that Servis' automobile was lawfully parked on the motel grounds and was locked. Servis was not apprehended in the vehicle nor was he arrested based upon a charge having a connection with the automobile. Deputy Farmer testified that he arrested Servis in the motel room for giving false information to a police officer and because he possessed a box of aluminum foil and a box of baking soda, which Deputy Farmer believed to be drug paraphernalia. The record contains no description of the alleged false information that gave rise to the arrest. On these facts the majority somehow concludes that the automobile, which was lawfully parked on the motel's lot, was impounded pursuant to the police "community caretaking function." I disagree.

Farmer's sole justification for impounding Servis' automobile was as follows:

> I placed him under arrest . . . . I stayed with the vehicle. I contacted the clerk at the front desk and advised her that the gentleman who was in the room had been arrested, that — did she want to take responsibility of the vehicle being left in the parking lot and she stated, she said no. At that point, I called for a wrecker. All vehicles that I tow personally I do an inventory on them.

The motel manager confirmed that Farmer contacted her but gave the following account:

> He come back and asked me if I was going to tow the car or he wanted — or if I wanted him to call somebody to tow it and I told him to go ahead and do it because I didn't know who to call.

The majority's assertion that the manager asked that it be moved or desired that it be moved is unsupported by this record. Clearly, Farmer's inquiry to the manager, implying that the car, if left on the motel's lot, would be her responsibility, was so deceptive that it produced her response. His inquiry whether she wanted to call someone to tow the automobile or whether she wanted him to cause it to be towed prompted the predictable, if not desired, response. Deputy Farmer's inquiry was, at the least, "disingenuous," and clearly placed the manager in the position of opting to have him tow the car. His manipulative inquiry indicates that his actions were motivated "more [by] investigative opportunism than [a] genuine solicitude for personal property." *Dixon v. State*, 23 Md. App. 19, 38, 327 A.2d 516, 527 (1974).

Furthermore, the Commonwealth does not contend that it was responsible for the automobile simply because Servis was arrested. It certainly cannot be seriously argued that, merely because Servis had arrived at the motel from Baltimore in an automobile, the Commonwealth had an obligation to protect the lawfully parked automobile. No statute or case law places such a burden on the Commonwealth. Moreover, there is no evidence in this record that the sheriff's department had a requirement or standard procedure requiring the officers to impound the automobile. Deputy Farmer testified: "I did not impound the car because of the arrest. I had the car towed because of the arrest. I impounded because of the drugs."

In *Opperman*, the Supreme Court stated that the "authority of police to seize and remove from the streets *vehicles impeding traffic or threatening public safety and convenience* is beyond challenge." 428 U.S. at 369 (emphasis added). The Court further stated in *Opperman* that "[t]he owner, having left his car illegally parked for an extended period, and thus subject to impoundment, was not present to make other arrangements for the safekeeping of his belongings." 428 U.S. at 375. In *Cabbler v. Commonwealth*, 212 Va. 520, 521, 184 S.E.2d 781, 782 (1971), *cert. denied*, 405 U.S. 1073 (1972), the impounded automobile had been

illegally parked so "as to partially block the ambulance driveway leading to the hospital emergency entrance." The driver in *Cabbler* also requested that the police close his vehicle's windows to protect it from the rain, and he made no protest when told that the vehicle would be removed to the city garage. 212 .Va. at 521, 189 S.E.2d at 782. In *Brown* the driver responded to an officer's signal to stop by "pull[ing] his car off the street into a small parking lot that serviced . . . businesses and apartments." 787 F.2d at 931. When given the option of having his vehicle towed or driven to the police station following his arrest for driving under the influence, he asked a police officer to drive it. *Id.* at 932.

In *Stevens v. State*, 412 So. 2d 456 (Fla. Dist. Ct. App. 1982), the court held that it was unreasonable to impound an automobile without advising the owner that "the motor vehicle will be impounded unless he or she can provide a reasonable alternative to impoundment." *Id.* at 457. In *Mitchell v. State*, 178 Ga. App. 244, 245-46, 342 S.E.2d 738, 740 (1986) the court stated:

> Although the State attempted at trial and on appeal to justify that search as an inventory pursuant to impoundment of the car, the record does not support that argument. There was no evidence of any connection between the car and appellant's arrest, no evidence that the car was illegally parked or was a hazard to traffic, or that appellant was consulted regarding alternate disposition of the vehicle. In short, there was no showing that the impoundment of the car was reasonably necessary.

*See also State v. Lunsford*, 655 S.W.2d 921, 923-24 (Tenn. 1983).

None of the circumstances cited in *Opperman, Cabbler, Brown, Stevens,* or *Mitchell* that support the validity and need for the impoundment of vehicles are present in the instant case. Servis' automobile was properly parked off the street and was neither impeding traffic nor posing a threat to public safety. Servis never requested that the police safeguard his automobile. The police never asked how he preferred his automobile to be handled. *Cf.* Code § 19.2-80.1. Furthermore, no evidence on this record supports the view that Servis' automobile was impounded in accordance with established policies of the Hanover Sheriff's Department. *Cf. Cabbler,* 212 Va. at 522, 184 S.E.2d at 782. The sole

justification for the decision to tow the automobile from the motel lot was that the owner of the automobile was arrested. The reason for arrest, however, bore no relationship to the existence of or ownership of the automobile. Servis was neither driving the vehicle when arrested nor charged with a traffic offense. The evidence, thus, fails to establish a reasonable connection between his arrest and the impoundment. *See Nolan v. State*, 588 S.W.2d 777, 780 (Tenn. Cr. App. 1979). In my view, the absence of such a connection gives rise to a reasonable inference of pretext.

None of the circumstances present in the valid impoundment cases cited are present in this case. Furthermore, Farmer's disingenuous actions, in placing responsibility for Servis' automobile upon the motel manager and the absence of a standard procedure requiring the impoundment of the automobile, raise the inference of improper motivation. "To have impounded the car and towed it away, under these circumstances, was a bizarre thing to do, explainable only as a subterfuge to search the car." *Dixon*, 23 Md. App. at 39, 327 A.2d at 527. The absence of evidence justifying the impoundment suggests that the impoundment of Servis' automobile was "a pretext concealing an investigatory police motive." *Opperman*, 428 U.S. at 376. Such an impoundment cannot be justified as a basis upon which to predicate a lawful inventory search.

### III.

Finally, even assuming that the entry and inventory search were authorized under law, I can find no basis to support the majority's conclusion that this record contains evidence to establish that Servis possessed the cocaine and marijuana with the intent to distribute it.

It is elementary that where, as here, an indictment charges an offense which consists of an act combined with a particular intent, proof of the intent is essential to conviction. . . . Because direct proof is often impossible in this type case, intent may be shown by circumstantial evidence. Existence of the intent, however, cannot be based upon surmise or speculation.

*Patterson v. Commonwealth*, 215 Va. 698, 699, 213 S.E.2d 752, 753 (1975)(citation omitted).

The majority concedes that the amount of cocaine and marijuana was "relatively small." In *Dukes v. Commonwealth*, 227 Va. 119, 313 S.E.2d 382 (1984), the Supreme Court reversed a conviction based upon circumstantial evidence in a case involving a "relatively small quantity of marijuana" and stated that the intent to distribute a controlled substance may be inferred from the quantity of the substance possessed by the accused "if it is greater than the supply ordinarily possessed for one's personal use." *Id.* at 122, 313 S.E.2d at 383. The evidence in this case neither establishes that the amounts of marijuana and cocaine were incompatible with Servis' defense that he possessed them for his own personal use nor provides a basis upon which to conclude that the quantities of marijuana or cocaine were greater than the supply ordinarily possessed by a narcotics user for personal use. *See Hunter v. Commonwealth*, 213 Va. 569, 570, 193 S.E.2d 779, 780 (1973).

The method of packaging adds nothing to the analysis whether Servis had an intent to distribute. "The mode of packaging and the way the packages were hidden are as consistent with possession for personal use as they are with intent to distribute. It is just as plausible that the defendant purchased the packaged substances for personal use as it is that [he] packaged the [substances] for distribution." *Dukes*, 227 Va. at 123, 313 S.E.2d at 384. "[P]ossession and ownership may imply intent to use rather than intent to distribute. . . ." *Hunter*, 212 Va. at 571, 193 S.E.2d at 780.

The majority's assertion that "paraphernalia used in the packaging process was seized" is pure surmise because no evidence in this record establishes that any of the cocaine or marijuana seized from Servis' room was packaged in aluminum foil. Nor is there any evidence that either substance was mixed with the baking soda. At no time did either officer testify that either item had been used to distribute the substances or to prepare the substances for distribution. Deputy Farmer testified that the foil and the baking soda could be used either for freebasing (a method of injecting cocaine) or for packaging the cocaine. Moreover, the evidence established that Servis was a drug user, and the search of his vehicle disclosed evidence that indicated he had in fact used the cocaine.

The record also contains an explanation for the cash in his possession and contradicts the majority's assertion that Servis had no

bank account and no satisfactory explanation for how he earned his money. All of the money that was seized was in large denominations and wrapped with Maryland bank labels. Servis testified that his bank account had a remaining balance of $10. He said that he had the large amount of money because he was on his way to Alabama, where he intended to relocate, and because he did not want to leave his money in the bank due to his belief that the Maryland financial institutions were having difficulties. He testified that he earned the money through his business as a shrimp salesman in Maryland. He further testified that his business consisted of purchasing large quantities of shrimp for sale and distribution to restaurants and roadside stands. Copies of his commercial trading licenses were placed in the record. Servis' testimony concerning his employment and his reason for having the money was uncontradicted, was supported by documentary evidence, and was not inherently improbable, contradictory, or inconsistent with the evidence.

When the Commonwealth's evidence is wholly circumstantial, " 'all necessary circumstances proved must be consistent with guilt and inconsistent with innocence and exclude every reasonable hypothesis of innocence.' " *Dukes v. Commonwealth*, 227 Va. at 122, 313 S.E.2d at 383 (quoting *Inge v. Commonwealth*, 217 Va. 360, 366, 228 S.E.2d 563, 567 (1976)). "Where inferences are relied upon to establish guilt, they must point to guilt so clearly that any other conclusion would be inconsistent therewith." *Dotson v. Commonwealth*, 171 Va. 514, 518, 199 S.E. 471, 473 (1938). "There is no stronger presumption afforded than that an accused is presumed to be innocent, which cannot be overthrown except by proof of his guilt beyond a reasonable doubt." *Id.* at 517, 199 S.E. at 473.

The evidence establishes possession beyond a reasonable doubt; however, the evidence and any inferences to be drawn from the evidence do not point so clearly to guilt of possession with intent to distribute as to make unreasonable a conclusion that Servis possessed the substances for his personal use. Thus, the evidence in this record, when viewed in the light most favorable to the Commonwealth, fails to exclude that reasonable hypothesis of innocence. *See Dukes*, 227 Va. at 123, 313 S.E.2d at 384.